**In re Andrew J. LANE, Debtor.**

**Bankruptcy No. 89–40268–JFQ.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 15, 1989.

Paul G. Igoe, Hinckley, Allen, Snyder & Comen, Providence, R.I., for Eastland Sav. Bank.

Charles R. Dougherty, Hill & Barlow, Boston, Mass., for Andrew J. Lane, debtor.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Eastland Savings Bank (the "Bank") moves under § 362(d)(1) and (2) of the Bankruptcy Code for relief from the automatic stay and for adequate protection with respect to its first mortgage and security agreement (the Bank's "mortgage") covering an office building recently constructed by the Debtor, Andrew J. Lane. Presented is the central question of the right of an oversecured creditor to continuation of the equity cushion during the reorganizational process.

For many years, the Debtor has been engaged, largely successfully, in all facets of the real estate business, primarily the construction of commercial and residential properties of all types. He does business in his own name and through three corporations and a partnership, all of whom have also filed Chapter 11 petitions with the Court. He personally holds title to the property in question, a 48,000 square foot office building situated on 9.83 acres at 250 Turnpike Road (Route 9), Southborough, Massachusetts. The construction financing furnished by the Bank is now in default. There is a balance due of $4,346,225.21 in principal, plus interest of $165,782.02 accrued to the date of trial and the Bank's accruing expenses incurred in enforcement of its rights. Interest accrues at $1,458.60 per day. Unpaid real estate taxes total about $17,000.00.

The building is substantially complete and now ready for leasing. Its interior has been left unfinished so that it may be "fitted out" to the specific needs of tenants, and some landscaping remains to be done. The appraisers for the parties, both competent, had divergent opinions of its fair market value. Opining at $4 million, the Bank's appraiser placed some reliance on all three approaches to valuation—replacement cost, income and comparable sales. The Debtor's appraiser believed the property to be worth $5.3 million; he relied primarily on the income approach, discounting the projected future income stream. As is usual with such testimony, each had its strengths and its weaknesses. Our jurisprudence would not be advanced by a detailed treatment here. I conclude that the building has a value of $4.8 million, leaving the Debtor with slightly more than a $200,000 equity, without regard to the accruing interest, taxes and expenses. This is about four percent of the property's value. The value of the Bank's mortgage interest may be somewhat less than $4.8 million, if costs of foreclosure and sale are taken into account. I also find that the property is not decreasing in value.

The Bank argues that it is deprived of adequate protection by such a slim equity margin which is continuing to erode due to accruing interest, taxes and expenses. This is the so-called "equity cushion" theory of adequate protection. That theory, however, does not withstand statutory analysis. Section 362(d)(1) of the Bankruptcy Code grants a party relief from the automatic stay "for cause, including lack of adequate protection of an interest in property of such party in interest." Section

506(a) provides that an allowed claim is "a secured claim to the extent of the value of such creditor's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." When § 506(a) is considered in the context of an oversecured creditor, it is apparent that the value of the "interest in ... property" which it speaks of is equal to the amount of the debt and not the value of the collateral. Otherwise, the amount of the claim would be the value of the collateral. The "interest in property" language appearing in § 362(d)(1) must be taken to have the same meaning in order to avoid inconsistency.

■ Section 361 brings this point home further. Adequate protection in the form of cash payments or new liens must provide value "to the extent that the stay ... results in a decrease in the value of such entity's interest in such property." Any other method of adequate protection must "result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." It is true, as often observed, that § 361 does not purport to contain an exhaustive list of the specific ways for a debtor to provide adequate protection or, as the observation is sometimes phrased, § 361 does not contain a definition of adequate protection, at least in the sense of how it is provided. But § 361 certainly does tell us what constitutes lack of adequate protection—a decline in the value of the secured creditor's interest in the property. We know from § 506(a) that this property interest cannot exceed the allowed amount of the claim. Thus there is no lack of adequate protection when the equity cushion above that amount is eroding through either a decline in collateral value or an increase in the claim due to the accrual of interest or expenses.

■ There is no support for the Bank in § 506(b), which gives a creditor the right to interest and costs (less the trustee's § 506(c) costs) to the extent that its "secured claim is secured by property the value of which ... is greater than the amount of such claim." The grant of future interest and expense rights falls far short of giving the Bank a present "interest in property" to the extent of the full value of the collateral. Section 506(b) does not use that phrase, in stark contrast to §§ 361, 362 and 506(a). Instead, the statute speaks of a claim "secured by property...." Section 506(b), moreover, makes a secured creditor's right to accruing interests and expenses subordinate to the § 506(c) right of a trustee or debtor in possession to be reimbursed from the collateral for the reasonable and necessary costs of preservation or disposition. Because these costs may be considerable and can accrue throughout the case, the oversecured creditor does not necessarily even have the right to collect accruing interest and costs from the collateral, much less a property interest to the extent of the entire collateral value. Perhaps most important, under § 506(b) the value of the secured claim *increases* through interest and expense accrual, so that on that ground alone the oversecured creditor does not lack adequate protection.

Nor can the equity cushion theory be conjured from the mystical phrase "indubitable equivalent" appearing in § 361(3). First, as discussed, the phrase is used there in reference to the value of the secured claim, not the value of the collateral. Second, it is also used in § 1129(b)(2)(A)(iii) in describing a way of dealing with a secured creditor at plan confirmation which is an alternative, to giving him, under § 1129(b)(2)(A)(i), retention of his lien and deferred cash payments having a value "of at least the value of such holder's interest in the estate's interest in such property." Here again, the controlling value is the value of the secured claim. Finally, in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) the Supreme Court removed much of the magic from "indubitable equivalent" when it denied that the phrase required the award of lost opportunity costs to an undersecured creditor.

The equity cushion theory cannot be justified after *Timbers*. If a creditor who is

undersecured at the beginning of the case is nevertheless considered to have adequate protection, one who stands only to lose his equity cushion, largely through earning additional interest, hardly seems worse off. In *Timbers*, also, the Court observed that the lost opportunity cost theory "makes nonsense of § 362(d)(2)" because under that theory the undersecured creditor always has cause to lift the stay, whereas under § 362(d)(2) lack of equity is not enough—the property must also be unnecessary for an effective reorganization. *Timbers* 108 S.Ct. at 632. Much the same can be said of the equity cushion theory, at least concerning evaporation of the cushion.

Significantly, the Court in *Timbers* emphasized the need for some trimming of usual creditor rights during the reorganizational process, stating: "The reorganized debtor is supposed to stand on his own two feet. The debtor in process of reorganization, by contrast, is given many temporary protections against the normal operation of the law." *Timbers* at 634. Normally, outside of bankruptcy, an oversecured creditor will be able to foreclose prior to the erosion of his equity cushion, just as an undersecured creditor is normally able quickly to realize upon his collateral. Each is required to make some sacrifice in Chapter 11, however, in order that all interests may benefit from a successful reorganization. "The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 220 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6179. If reorganization is to be accomplished and the interests of creditors, stockholders and employees are all to be accommodated, some curtailment of the rights of each is clearly necessary. Congress chose to limit the rights of a secured creditor to protection of the value of its security interest. Whether it was constitutionally necessary to assure the maintenance of even this property interest is a matter of some debate. *Compare, e.g.,* Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause,* 96 Harv.L.Rev. 973 (1983) *with* Murphy, *Use of Cash Collateral in Business Rehabilitation: A Suggested Redrafting of Section 7-203 of the Bankruptcy Reform Act,* 63 Calif.L.Rev. 1483 (1975). But few would seriously contend that the taking clause of the Fifth Amendment requires Congress to protect the equity cushion so as to eliminate a risk that the secured creditor had assumed.

With interest running at about $45,000 a month, the Bank's equity cushion will soon disappear (unless its secured claim is later revalued), and the Bank will be in the position of the undersecured creditor in *Timbers*—unable to earn further interest. The Debtor then being without equity, § 362(d)(2) would come into play. *Timbers* also made a contribution to this troublesome situation. It requires the reorganization to be "in prospect" in order for a debtor to prevail under § 362(d)(2), rejecting the view (*E.g., Empire Enterprise, Inc. v. Koopmans (In re Koopmans),* 22 B.R. 395 (Bankr.D.Utah 1982)) that the statute requires only the need for the property in business operations. The Bank is therefore assured that its claim will not be left to wither while the Debtor is mired in a long and hopeless reorganization. A reorganization appears at present to be "in prospect." Counsel for the Debtor has expressed an intention to file a plan within two months, which is prior to the end of the extended period in which it has exclusive plan filing rights.

Although certainly not determinative of the merits, rejection of the equity cushion theory has practical virtues. Because the value of the collateral and the claim it secures then become immaterial, all that matters is whether the value of the secured claim is declining, and this is significant only if the decline is about to drop the

secured claim's value below the debt. Valuation of secured claims can be particularly troublesome. Not only does the process involve the usual valuation problems, there can also be uncertainty of whether the standard of valuation should be some form of liquidation value or a going concern value, an issue which § 506(a) leaves to be decided on a case-by-case basis. These valuation problems can be reminiscent of those faced by courts under the fair and equitable principle of absolute priority which prevailed in Chapter X of the former Bankruptcy Act, a thicket which Congress purposely avoided in writing the present Code. See H.R. 95–595, 95th Cong., 1st Sess. 225 (1977), U.S.Code Cong. & Admin. News 1978, p. 6184.

Many of these statutory and policy considerations have persuaded some of the courts, and apparently most of the writers, that the equity cushion theory is without merit. See, e.g., McCombs Properties VI, Ltd. v. First Texas Savings Ass'n (In re McCombs Properties VI, Ltd.), 88 B.R. 261 (Bankr.C.D.Cal.1988); In re Triplett, 87 B.R. 25 (Bankr.W.D.Tex.1988); Bankers Life Ins. Co. of Nebraska v. Alyucan Interstate Corp. (In re Aluycan Interstate Corp.), 12 B.R. 803 (Bankr.D.Utah 1981); Nimmer, Secured Creditors and the Automatic Stay: Variable Bargain Models of Fairness, 68 Minn.L.Rev. 1, 44 (1983); O'Toole, Adequate Protection and Postpetition Interest in Chapter 11 Proceedings, 56 Am.Bankr.L.J. 251 (1982).

The theory also has no basis in pre-Code case law. Prior to the Code, the cases developed no principles protecting an equity cushion against post-petition interest accruals. See, O'Toole, Adequate Protection and Postpetition Interest in Chapter 11 Proceedings, 56 Am.Bankr.L.J. 251 (1982). City Corp. Bus. Credit v. Blazon Flexible Flyer, Inc. (In re Blazon Flexible Flyer, Inc.), 407 F.Supp. 861 (N.D.Ohio 1976) is not authority for the equity cushion theory, although it is sometimes cited for it. The Court was there dealing with broad considerations under the taking clause of the Fifth Amendment, in the context of a debtor who wished to continue to use inventory and receivables where these and the other

collateral were worth about four times the secured debt. The Court came to the obvious conclusion that continued use was constitutionally permissible, observing that the creditor was "more than adequately protected." Id. at 865. The Court also speaks of society's interest in promoting business reorganizations.

Despite this void in the prior cases and the mandate of the Code's provisions, a surprisingly large body of case law has grown under the Code embracing the theory. Many of these decisions were able to adopt the theory rather easily because of the presence of what the Court regarded as an adequate cushion. Vlahos v. Pitts (In re Pitts), 2 B.R. 476 (Bankr.C.D.Cal.1979) was the first decision. Property valued at $125,000 provided a cushion of about $19,-000 over the total of a first mortgage debt of $62,260, the plaintiff's second mortgage of $34,615 and estimated foreclosure costs of $9,000. The plaintiff contended that this cushion was inadequate. The debtor did not argue that no cushion was necessary, but rather that this one was sufficient to provide adequate protection. Drawn into the fray on that basis, the Court seemed less impressed by the various statutory provisions than it was by a sentence in the legislative history which states that "[s]ecured creditors should not be deprived of the benefit of their bargain." H.R.Rep. No. 95–595, at 339, U.S.Code Cong. & Admin.News 1978, p. 6295. It concluded from these words that maintenance of the cushion was part of the parties' bargain and therefore necessary for adequate protection, with little analysis of the statutes or the considerations flowing from the over-all goal of reorganization. The Court ruled that the cushion was barely adequate pending a final hearing, which it set down at an early date. The secured creditor in Timbers also sought support in this "benefit of their bargain" statement. The Supreme Court quickly rejected "[s]uch generalizations" as "inadequate" in light of the statutory text. Timbers 108 S.Ct. at 634.

Heritage Savings & Loan Ass'n v. Rogers Development Corp. (In re Rogers Development Corp.), 2 B.R. 679 (Bankr.E.D.

Va.1980) is another early case which helped spawn the equity cushion theory. The cushion there was about $130,000 over the $620,000 total of the plaintiff's mortgage debt and senior liens. Concluding that a cushion was necessary, the Court regarded the $130,000 cushion as adequate and denied relief. It engaged in less analysis than did the *Pitts* court, relying primarily on the *Flexible Flyer* decision and a statement in *Collier* that an equity cushion can constitute adequate protection. (*Collier on Bankruptcy*, para. 361.02[3] at p. 361–9 (15th ed. 1979)). Later decisions endorsing the equity cushion theory have for the most part relied upon such early precedents, without closely examining the statutory framework. *See, e.g., Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396 (9th Cir. 1984) (20% equity cushion considered adequate); *The Travelers Ins. Co. v. Plaza Family Partnership (In re Plaza Family Partnership)*, 95 B.R. 166 (E.D.Cal.1989) (50% equity cushion adequate); *In re Cardell*, 88 B.R. 627 (Bankr.D.N.J.1988) (cushion of almost 50% adequate); *First Agricultural Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the Berkshires, Inc.)*, 46 B.R. 892 (Bankr.D.Mass. 1985) (equity cushion of at most 8% deemed inadequate); *U.S.A. v. Smithfield Estates, Inc., (In re Smithfield Estates, Inc.)*, 48 B.R. 910 (Bankr.D.R.I.1985) (collateral valued at $4.5 million to $5.0 million deemed insufficient to provide an adequate equity cushion for $4.7 million debt; debtor required to commence monthly interest payments and cure arrearage); *In re Hagendorfer*, 42 B.R. 13 (Bankr.S.D.Ala.1984) *aff'd Hagendorfer v. Marlette*, 42 B.R. 17 (S.D.Ala.1984) (equity cushion of 9.3% to 12.2% inadequate); *In re Schaller*, 27 B.R. 959 (W.D.Wis.1983) (cushion of 17%–18% inadequate); *Sanders v. Tucker (In re Tucker)*, 5 B.R. 180 (Bankr.S.D.N.Y.1980) (7.4% cushion inadequate).

■ The Bank is entitled to relief in one respect. When the cushion disappears, the value of its mortgage interest will begin to decline if taxes on the real and personal property (including interest on taxes now due) continue to go unpaid, because these taxes have priority over the Bank's mortgage. The Bank is entitled to adequate protection against this decline in value. Because of the imminence of the decline, and the small amount of the present tax bill, I will condition continuation of the stay upon the Debtor paying all real and personal property taxes.

Because I find that the Debtor for the present has equity in the property, it is unnecessary to discuss the Bank's contentions under § 362(d)(2).

It is accordingly

ORDERED, that a continuation of the automatic stay is hereby conditioned upon the Debtor paying, within thirty days from today, all taxes, including interest, presently due on the property, and upon the Debtor paying, prior to their semi-annual due dates, all future taxes on the property. The motion is otherwise denied, without prejudice; it may be renewed at any time.