**In re Peter W. WASSERMAN, Debtor.**

**In re Sharon M. CERNY, Debtor.**

**Bankruptcy Nos. 90–13034–JNG, 90–13947–JNG.**

United States Bankruptcy Court, D. Massachusetts.

Jan. 17, 1991.

Peter J. Haley, Gordon & Wise, Boston, Mass., for debtors.

Daniel J. Carragher, Day Berry & Howard, Boston, Mass., for creditor.

JAMES N. GABRIEL, Chief Judge.

### INTRODUCTION

Peter W. Wasserman ("Wasserman") filed a voluntary petition under Chapter 11 on June 11, 1990. His spouse, Sharon M. Cerny ("Cerny") filed a voluntary petition under Chapter 11 approximately five weeks

---

later on July 23, 1990. Wasserman and Cerny (collectively the "Debtors") are trustees of and each hold a fifty percent beneficial interest in a Massachusetts trust known as the 1815 Realty Trust.[1]

HomeFed Bank, Federal Savings Bank ("HomeFed" or the "Bank") is a secured creditor of the 1815 Realty Trust and a creditor of both Wasserman and Cerny pursuant to guaranties and amended guaranties they executed on November 14, 1986 and April 14, 1988, respectively. The 1815 Realty Trust is indebted to HomeFed on account of a promissory note dated November 14, 1986 in the principal amount of $19,200,000. The debt is secured by a Mortgage and Security Agreement, and an Assignment of Rents and Leases, covering real property in Cambridge and Somerville, Massachusetts known as the Porter Exchange Building.[2]

In late July, 1990, HomeFed moved in both cases for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (d)(2) of the Bankruptcy Code so as to exercise any and all of its rights and remedies under its mortgage and related loan documents. The hearings on the motions were consolidated. Accordingly, the Court conducted evidentiary hearings with respect to both motions on October 12, 1990, November 1, 1990 and November 29, 1990.[3] Seven witnesses testified, including two expert appraisers, Donald H. Reenstierna ("Reenstierna") and Richard E. Bonz ("Bonz") of Leggat McCall Advisors, Inc., and Sharon Cerny.

## FACTS

The property upon which HomeFed has a first mortgage consists of several parcels of land on Massachusetts Avenue, including the site of the old Sears Roebuck building in Porter Square, Cambridge. Wasserman and Cerny intended to develop the site as a mixed use office and retail complex with a movie theater. According to the Debtors' virtually identical disclosure statements, which were introduced into evidence, Wasserman acquired the Sears building in 1985 and infused $4 million of his own funds into the project for clearing and demolition work. Wasserman and Cerny closed on a construction loan with HomeFed in November of 1986 and entered into a construction contract with Marshall Contractors, Inc. at approximately the same time. Due to cost overruns and significant delays, the project, which was originally scheduled to open in late summer of 1987, did not open until December of 1988 at which time it was still unfinished.

The Director of Leasing for the Porter Exchange Building, Shannah Hall ("Hall"), testified that the initial merchandising efforts for the Porter Exchange were directed toward attracting upscale, national retailers to space on the first and second levels of the building, as well as the lower level. Due to an economic decline in the apparel industry in late 1987 and the stock market crash in October of that year, Hall stated leasing efforts were redirected toward more service oriented businesses. Specifically, she indicated that on the lower level her efforts were and are directed toward attracting health and personal care businesses and on the first floor toward businesses selling food and hard goods. The second floor has been converted from retail to office space. The third and fourth levels are earmarked for office space. Hall stated that the embrace of local retailers has been successful, particularly since the property is within 100 feet of an MBTA station and that several leases have been signed with Court approval since Wasserman's June 11, 1990 filing.

At the time of the commencement of the bankruptcy proceedings, according to the

---

**1.** The 1815 Realty Trust filed a voluntary petition under Chapter 11 on June 11, 1990. That petition was dismissed on June 26, 1990 after a ruling by the Court that the trust was ineligible to be a debtor.

**2.** HomeFed's motions for relief from stay detail the various amendments to the mortgage and

assignment of rents none of which are directly pertinent to the issues before the Court.

**3.** HomeFed waived the time requirements imposed by Bankruptcy Rule 4001 and 11 U.S.C. § 362.

Debtors' appraiser, the office portion of the building contained approximately 106,856 square feet of rentable space (15,000 square feet were added by the conversion of the second floor from retail to office space through the elimination of common areas). Only 6,158 square feet of the office portion were occupied, leaving a vacancy of 100,698 square feet. The lower level and first level had 81,845 square feet of gross leasable area, of which 68,165 square feet were occupied by 20 tenants, leaving a vacancy of 13,680 square feet.

Ms. Hall testified that since the Debtors' filings office leasing has risen by 38 percent, primarily as a result of a five year lease with the Smithsonian Astrophysical Observatory. She also indicated that retail leasing has risen by 8,000 square feet or 28 percent. Of that amount, she attributed approximately 4,900 square feet to a new lease with The Gap and approximately 2,200 square feet to the expansion of an existing lease with the Cottonwood Cafe. Hall concluded that, as of October 1, 1990, 70 percent of the building was leased, compared to less than 50 percent at the time of the June 11, 1990 filing, yielding an additional $1.6 million in gross annual income for the project. Hall also noted that Bedford Hill Corporation has expressed interest in leasing 10,000 square feet of space at an annual rental of $500,000 for use as residential suites. Indeed, her $1.6 million figure is predicated upon the entry into a lease with that entity.

Despite the substantial progress made by the Debtors in leasing space that was vacant at the time of the commencement of their cases, there is no dispute that the value of the Porter Exchange project is less than the amount of HomeFed's claim. Homefed's expert, Reenstierna, testified that the value of the property as of September 18, 1990, was $19,400,000. The Debtors' appraiser testified that the value of the property was $11,000,000 as of June 11, 1990. The Debtors' real estate abatement specialist, Charles R. Laverty, Jr. ("Laverty"), testified the value was $11,700,000 as of January 1, 1990. Sharon Cerny indicated that she believed the present value of the property to be $14–15

million. The assessed value of the property is in excess of $20 million.

The two expert appraisers agreed that the highest and best use of the property was and is as mixed use office and retail development with, at least in Reenstierna's view, minor residential use. They also agreed that the cost approach to valuation was inapplicable. Although both appraisers relied almost exclusively on the income approach to valuation, Bonz, in his words, also used the market data approach "in an effort to lend support to the value derived from the income approach to value," and, therefore, included detailed information about comparable sales. Bonz arrived at a value of $13.5 million for the Porter Exchange using the market data approach. Reenstierna referred to the use of the market data approach but did not include specific instances of comparable sales in his report as did Bonz.

The appraisals did not differ markedly in the rent per square foot attributable to the office and retail space available at the Porter Exchange Building. Both appraisers utilized $17 per square foot for their estimate of market rent for office space and $18 per square foot for their estimate of market rent for retail space on the lower level of the Porter Exchange. However, Reenstierna utilized an estimate of $28 per square foot for the first floor retail space, while Bonz utilized a lower figure—$25 per square foot. However, this discrepancy is minimized to some extent because Bonz estimated that the 7,308 square feet (approximately 2,100 square feet of which were unoccupied as of June 11, 1990) attributable to the so-called common market area would be rented at $35 per square foot.

The two appraisals differed materially with respect to timing, however. Bonz appraised the building as of June 11, 1990 and, therefore, did not consider the Smithsonian lease or The Gap lease. These two leases were negotiated prior to the filings but were only finalized and entered into with Court approval post-petition. Thus, Bonz's appraisal is predicated on a markedly higher vacancy rate (61%) than

Reenstierna's appraisal (33%). Additionally, the appraisers differed as to other significant components of an income appraisal, namely the gross annual income, the total annual operating expenses, the rate of absorption of vacant space, the anticipated transaction costs associated with a sale, and the capitalization and discount rates. The Court concludes that the Reenstierna appraisal is entitled to considerably more weight than the Bonz appraisal because of Bonz's failure to consider the Smithsonian and Gap leases. While the Court cannot criticize Bonz for failing to include those leases in his appraisal because they were not in fact signed on June 11, 1990, Bonz should have been instructed to provide an alternative valuation predicated upon their eventual execution because the testimony clearly established that the leases were likely to be consummated. Accordingly, and in view of the Cerny's candid assessment of the property's worth, and after discounting Reenstierna's appraisal for the inherent bias and inexactness of the appraisal process as well as the depressed state of the real estate market, which the Court judicially notes, the Court concludes the property is worth $16.5 million as of November, 1990.

The Debtors introduced evidence that post-petition real estate taxes in the amount of $196,581.46 have been paid on the property, leaving a balance of approximately $19,000, at least with respect to 1815–1843 Massachusetts Ave. parcel. The record also reveals that interest has accrued on outstanding real estate taxes in the approximate amount of $1.1 million, although no dollar amount was articulated by any of the witnesses.[4]

## DISCUSSION

HomeFed Saving's Bank is seeking relief from stay under both section 362(d)(1) and section 362(d)(2) of the Bankruptcy Code. 11 U.S.C. § 362(d) Section 362(d) provides in relevant part:

[4] The Debtors' plans and disclosure statements contemplate procurement of a loan with a 14% interest rate to pay approximately $1.1 million due the City of Cambridge. The Debtors' pro

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). Section 362(g) allocates the burden of proof. The Bank has the burden of proof on the issue of the Debtors' equity in the property. The Debtors have the burden of proof as to all other issues. 11 U.S.C. § 362(g). Accordingly, the Debtor must establish by a preponderance of the evidence that HomeFed is adequately protected and that the Porter Exchange Building is necessary to an effective reorganization.

With respect to section 362(d)(1), as an undersecured creditor, HomeFed is not entitled to adequate protection payments unless the property is decreasing in value. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). HomeFed argues that the property is decreasing in value because interest is accruing on unpaid, pre-petition real estate taxes and overall market conditions are deteriorating. HomeFed cites *In re Lane*, 108 B.R. 6 (Bankr.D.Mass.1989), where the court stated:

When the [equity] cushion disappears, the value of its [the Bank's] mortgage interest will begin to decline if taxes on the real and personal property (including interest on taxes now due) continue to go unpaid, because these taxes have priority over the Bank's mortgage. The Bank is

forma for 1991 income and expenses incorporates a loan at 12% in the amount of $1.3 million for these taxes.

entitled to adequate protection against this decline in value.

108 B.R. at 11. HomeFed also cites *Matter of East–West Associates*, 106 B.R. 767 (Bankr.S.D.N.Y.1989). In that case, the court ruled that an undersecured bank, although not entitled to pre-petition interest on real estate taxes where the principal had accrued prior to the filing, was entitled to post-petition interest accruing on unpaid real estate taxes. 106 B.R. at 773.

The Debtor has presented evidence through several witnesses that the property has increased in value since the filings. Despite the fact that the Court cannot accept the Debtors' valuation of the property at the time Wasserman filed, the Court accepts the testimony that the entry into significant new leases has substantially increased the value of the property. Although the Debtors have been unable to quantify to the satisfaction of the Court the actual dollar amount of the increase in value of the property, the Bank also has failed to quantify the decline in value, having neither attributed a dollar value to the post-petition interest accruing on the unpaid real estate taxes nor the decline in value due to the deteriorating real estate market in New England. In reliance upon the undisputed fact that the new leases will generate in excess of $1 million in gross annual income, the Court concludes that the increase in value outweighs any decrease in value stemming from unpaid taxes and the deteriorating real estate market, including $19,000 in unpaid post-petition real estate taxes. Accordingly, HomeFed is not entitled to relief from stay under section 362(d)(1).

With respect to section 362(d)(2), the only issue is whether the property is "necessary to an effective reorganization." The United States Supreme Court, admittedly in dicta, has stated:

What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts ... have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'

*United Savings Association v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. at 375–76, 108 S.Ct. at 632–33 (emphasis in original) (citation omitted).

HomeFed and the Debtors differ as to what is required to meet this so-called feasibility test enunciated by the Supreme Court in *Timbers.* The Bank argues that the starting point for a feasibility analysis is a determination of whether the Debtors' plans are fair and equitable with respect to its secured claim. Assuming it votes to reject the Debtors' plans, HomeFed, as a dissenting impaired class would have to receive cash payments with a present value as of the plans' effective date at least equal to the value of its collateral, i.e., $16.5 million.[5] HomeFed asserts that the $13 million value attributed to its secured claim in the Debtors' plans, in light of what it considers to be the value of the property, compels the conclusion that its claim will not be treated fairly and equitably. *See* 11 U.S.C. § 1129(b)(2).

The Bank criticizes the Debtors for relying upon one set of very low income figures to "cram down" its secured position (i.e., those employed by Mr. Bonz) and another set of very high income figures to establish cash flow to meet the feasibility requirements of section 1129 (i.e., those employed by Cerny in a pro forma introduced into evidence as defendants' exhibit 6). It also raises the spectre of a violation of the absolute priority rule. The Bank points out that the Debtors' plans contem-

---

**5.** The Court has not attempted to value the property as of the Debtors' filing dates. Section 506(a) of the Bankruptcy Code states that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a). Since adequate protection is not at issue, but the effectiveness of the Debtors' plan is, the Court has focused upon the value of the property today, not the value seven months ago. *See generally* 3 *Collier on Bankruptcy,* ¶ 506.04[2] (15th ed. 1990).

plate a retention of an interest in the Porter Exchange and other property despite the fact that neither it nor the unsecured creditors will be paid 100 percent of their claims. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). HomeFed questions the viability of the "infusion of new capital" exception to the absolute priority rule espoused by the Supreme Court in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 122, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939) ("to accord 'the creditor his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution of money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder"), in light of its recent decision in *Norwest Bank Worthington v. Alers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). *See generally Matter of Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla.1989).

The Debtors belittle the Bank's position arguing that hearings on motions for relief from stay should not be turned into mini-confirmation hearings. The Debtors' cite, among other cases, *In re Broad Associates Ltd. Partnership*, 110 B.R. 632 (Bankr.D. Conn.1990). In that case, the court stated:

> Courts in this circuit [the Second Circuit] since *Timbers* have held that under the "feasibility" test, a debtor need not demonstrate that its proposed plan of reorganization is confirmable. *Cateret Savings Bank v. Nastasi–White, Inc. (Matter of East–West Assoc.)*, 106 B.R. 767, 774 (S.D.N.Y.1989) ... It is implicit in that test, however, that the proposed plan must avoid statutory flaws that would prohibit confirmation. In addition, the debtor must prove that 'the things which are to be done after confirmation can be done as a practical matter.'

110 B.R. at 636 (citations omitted).

The Court finds that the Debtors' certainly have failed to establish that the plans now on file with the Court are in fact confirmable. Clearly, the $13 million dollar valuation of the secured portion of the Bank's claim and the proposed refinancings of the Porter Exchange, which are predicated upon dramatic increases in the valuation of the property, make it impossible for the Court to find that the plans are confirmable. Both the Bank's compelling observations with respect to the deficiencies in the Debtors' plans, and the *Yasparro* court's observation that confirmed individual Chapter 11 plans involving "cramdowns" are rare, 100 B.R. at 96 n. 5, warrant consideration, if not concern, on the part of the Debtors. Were it not for the fact that the Debtors, as sophisticated business people, have made substantial progress in attracting new tenants to the Porter Exchange and have filed plans which at least are the subject of negotiation and interest on the part of the large body of unsecured creditors, as well as the Court's agreement with the Debtors' legal proposition that hearings on relief from stay should not be mini-confirmation hearings, the Court would be inclined to rule that an *effective* plan of reorganization is not in prospect.

However, the Court rules that, using an admittedly lenient standard, the Debtors' have met their burden of proving that a reorganization is in prospect. Nevertheless, the Court is not sanguine that the Debtors will be able to overcome the serious practical and legal hurdles that face them. Moreover, the Court will not subject HomeFed to the increased risks associated with protracted delays in connection with attempts to confirm plans that may never pass muster. Therefore, the Court denies the Bank's motion for relief from stay on the condition that the Debtors obtain confirmation of their plans within 75 days of this date. If the Debtors fail to obtain orders from this Court confirming their plans within that time, the Court will entertain favorably renewed motions on the part of the Bank.