**In re Mitchell B. ROBBINS, Debtor.**

**Bankruptcy No. 90–40181–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 11, 1990.

**2**

William R. Moorman, Jr., Craig and Macauley, Boston, Mass., for debtor.

Jason Rosenberg, Rosenberg & Kitaeff, North Andover, Mass., for Kevin C. Sullivan.

Barbara Theberge, Bank of New England, Boston, Mass., for Bank of New England, N.A.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Asserting that he lacks adequate protection of his second mortgage interest, Kevin C. Sullivan ("Sullivan") moves under 11 U.S.C. § 362(d)(1) for termination of the automatic stay in order to foreclose under the mortgage. Presented is the important question of which standard of valuation—fair market value or liquidation value—should be employed in this context, and whether costs of sale should be taken into account under either standard.

Among the Debtor's numerous investment properties is a 38 unit apartment building in Billerica, Massachusetts which is subject to two mortgages, a first mortgage held by Bank of New England, N.A. (the "Bank") and a second mortgage held by Sullivan. The balance of principal and interest due under the Bank's first mortgage is about $1,180,000, and under Sullivan's second mortgage about $450,000. Current real estate taxes are being paid, but the Debtor is not paying interest to Sullivan or to the Bank on its first mortgage debt. The Bank's debt accrues interest at the rate of about $12,000 per month. The Bank has also filed a motion under § 362 which has not yet been heard with respect to adequate protection issues.

Sullivan claims that the property has a fair market value of $1,600,000, arguing that he lacks adequate protection of his second mortgage interest because he is already undersecured and his mortgage interest is decreasing in value as the result of interest accruals on the Bank's senior debt. The Debtor asserts that the property has a fair market value of $1,900,000, and contends that the resulting value cushion of almost $300,000 over the two mortgages provides adequate protection for the Sullivan mortgage.

On the surface, there is little to choose between the testimony of the parties' appraisers. Both are well qualified, and both base their opinions of value on a combination of the direct sales comparison approach and the income approach. Close analysis, however, favors the Debtor's appraiser. In arriving at his average unit value of $50,000, he alone included among his comparable sales the bulk sale of an aborted condominium project in the same town which had an average price of $72,471 per unit. Moreover, his technique under the income approach was more impressive. Using an over-all capitalization rate of 10.15%, he eschewed a discounted cash flow analysis. The latter technique, employed by Sullivan's appraiser, projects rents for seven years and applies a discount factor to arrive at both the present value of the projected rents and the present value of the "reversion" over the mortgage. It also involves estimation of future appreciation in value and estimation of an assumed mortgage amount and interest rate. This technique suffers from defi-

ciencies of complexity and speculation of what will occur in the future. Thus I am not surprised by the experience of the Debtor's appraiser, who testified that his reviews of prior discounted cash flow analyses disclose a sixty percent rate of error in the assumptions and projections used. I therefore favor the Debtor's appraisal and find that the fair market value of this property is $1,900,000.

Sullivan's mortgage interest would lack adequate protection if its value were declining for any reason such as encroaching interest accruals on the Bank's senior mortgage. *In re Andrew J. Lane,* 108 B.R. 6, 11 (Bankr.D.Mass.1989). If fair market value were the controlling valuation standard here, a fair market value of $1,900,000 would mean that Sullivan is oversecured, so that his mortgage interest is not presently being eroded by continuing accruals on the Bank's senior debt. *Id.*

The fair market value of collateral, however, is not usually the controlling valuation standard. Nor should valuation under any standard ignore expenses of sale. Section 362(d)(1) does not speak in terms of providing adequate protection of the value of the collateral. It requires adequate protection of the creditor's "interest in property." This wording is crucial, for the same phrase is used in the section establishing the nature and value of a secured claim. A creditor's claim is secured "to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a). A claim is unsecured "to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." *Id.* The phrase "the value of such creditor's interest" is not equivalent to the value of the collateral. Section 506(a) uses the term "property" when referring to the collateral. Section 506(b) draws the distinction even more clearly. In permitting fees, costs or charges to be paid from excess collateral, § 506(b) distinguishes between the amount of an "allowed secured claim" and "property the value of which ... is greater than the amount of such claims...."

We are therefore concerned with the valuation of a limited property interest, a second mortgage. Congress recognized that the valuation of a secured claim would not involve the normal valuation process. Section 506(a) provides that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property...." Legislative history tells us that this language is intended to refer to standards of valuation. The House report states: "'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6312.

I thus have the task of ruling upon the proper standard of valuation of this mortgage interest, as well as with finding the precise value within that standard. My only guidance in establishing the standard is to do so "in light of the purpose of the valuation and of the proposed disposition or use of such property...." § 506(a).

The purpose of this valuation sheds no light on the standard to be used. We are not concerned, for example, with a valuation under § 1129(a)(7) of property which creditors would receive or retain in a liquidation, where liquidation value is perhaps most relevant.

There is no "proposed disposition" of this property before the court. The Debtor's present intent is to retain it. If he had signed an agreement of sale, value would presumably be fixed in accordance with that agreement, assuming that the sale had court approval. The words "proposed disposition" would also have significance if the Debtor were attempting to sell the property. It would then make sense to use fair market value as a base and discount that value to reflect whatever the possibility might be that a foreclosure would preempt the sale. This was the technique used in *In re Phoenix Steel Corp.,* 39 B.R.

218 (D.Del.1984). There, an investment banker was attempting to sell the Debtor's business. The court discounted an estimated going concern value for the possibility that the business would not survive as a going concern during the necessary marketing period, and for the additional possibility that a buyer would not be found.

■ There is, of course, the possibility that the property will be sold at private sale for its fair market value of $1,900,000. But this seems a remote possibility in light of the Debtor's present plans and the slow real estate market locally. Nevertheless, the possibility of a private sale is arguably some enhancement in value. *In re Phoenix Steel Corp.*, 39 B.R. 218 (D.Del.1984). Any relatively small enhancement in value due to such a possibility, however, is more than offset by the depressant in value caused by sales expenses. I conclude from the evidence on this issue that the expenses from a private sale for a broker and attorney would total about $60,000. Because we are valuing only the creditor's interest in the property, an interest whose value depends not on enjoyment of the property but rather on its sale, such expenses are proper deductions in arriving at the value of a mortgage interest. *E.g., In re Coby*, 109 B.R. 963, 965 (Bankr.D.Nev.1990) (hypothetical cost of liquidating debtor's homestead deducted when valuing creditor's secured claim in debtor's residence under Chapter 13 plan, notwithstanding debtor's proposed retention of home); *In re Smith*, 92 B.R. 287, 289–91 (Bankr.S.D. Ohio 1988) (same); *In re Boring*, 91 B.R. 791, 794–95 (Bankr.S.D.Ohio 1988) (no relief to mortgagee from post-confirmation stipulation where mortgagee did not know that the Chapter 13 trustee would deduct hypothetical cost of sale from valuation); *In re Claeys*, 81 B.R. 985, 990–92 (Bankr.D. N.D.1987) (in valuing a mortgagee's secured claim pursuant to a Chapter 12 plan court must account for potential costs of disposal anticipated in a commercially reasonable disposition). *Contra, e.g., United States v. Case (In re Case)*, 115 B.R. 666, (B.A.P. 9th Cir.1990) (costs of sale not deducted in valuation of secured claim under Chapter 12 plan, with dictum that deduc-

tion is permissible in valuation for adequate protection purposes); *In re Courtright*, 57 B.R. 495 (Bankr.D.Or.1986) (debtor's intention to retain property makes sales expenses improper deductions in determining value of security interest).

■ The statutory phrase "proposed ... use of such property" is somewhat more opaque. It apparently has significance only as the converse of "proposed disposition," so that the entire phrase "the proposed disposition or use" is equivalent to "any proposed disposition." It makes no sense to attach independent significance to the Debtor's use of the property. Use of collateral by a debtor, even one who has placed his financial house in order, is a neutral factor in establishing a standard of valuation. We are dealing here with valuation of a mortgage interest and not the property itself. Except to the extent that a sale at fair market value is a substantial possibility, a security interest is worth what it will bring at a commercially reasonable foreclosure. *In re Tenney Village Co. Inc.*, 104 B.R. 562, 565 (Bankr.D.N.H. 1989) (real estate); *In re T.H.B. Corp.*, 85 B.R. 192, 195–96 (Bankr.D.Mass.1988) (equipment, inventory and receivables); *In re Claeys*, 81 B.R. 985, 991 (Bankr.D.N.D. 1987) (real property, livestock and farm machinery); *In re Cook*, 38 B.R. 870, 875 (D.Utah 1984) (car); *In re Damron*, 8 B.R. 323, 326 (Bankr.S.D.Ohio 1980) (furniture); *Virginia Nat'l Bank v. Jones (In re Jones)*, 5 B.R. 736, 739 (Bankr.E.D.Va. 1980) (car). A debtor's operation of property or a business may make foreclosure unlikely, depending upon the profitability of the operation, but it does not affect the true worth of the security interest. I therefore disagree with those decisions that adopt a standard of fair market value or going concern value due to a debtor's on-going operations. *See In re Beker Industries, Corp.*, 58 B.R. 725 (Bankr.S.D.N. Y.1986) (miscellaneous assets); *In re Automatic Voting Mach. Corp.*, 26 B.R. 970 (Bankr.W.D.N.Y.1983) (real estate and equipment); *In re QPL Component, Inc.*, 20 B.R. 342 (Bankr.E.D.N.Y.1982) (inventory); *First Nat'l Bank of McDonough v.*

*Shockley Forest Industries, Inc. (In re Shockley Forest Industries, Inc.),* 5 B.R. 160 (Bankr.N.D.Ga.1980) (real estate).

■ Normally, outside of Chapter 11, there is a factor enhancing the value of a mortgage interest which has nothing to do with the fair market value or liquidation value of the property. A mortgagor typically wishes to honor his obligation in order to avoid foreclosure, without regard to whether or not some of the mortgage debt may in fact be unsecured. But that consideration is not present in any degree here because of the Debtor's ability to obtain confirmation of a "cram down" plan proposing a payment schedule having a present value equal only to Sullivan's "interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). Thus the value of the Sullivan mortgage can never rise above the value of its property interest aspects at the time of confirmation.

■ Applying these principles to the present circumstances, I conclude that there is no reason to depart from the general rule that a mortgage interest is worth what it will bring at foreclosure. The Debtor's intention to retain the property means that Sullivan cannot reasonably anticipate being paid in the near future from the proceeds of a private sale producing the property's fair market value. A more likely possibility is foreclosure by the Bank or Sullivan, either during this Chapter 11 case or following its conversion to a case under Chapter 7. I must also bear in mind the statistic that the chances of a small or medium-sized business surviving a Chapter 11 are about one in ten, Wall St. J., July 14, 1988, at 29, col. 1, and that at present there is only a reasonable possibility of the Debtor successfully reorganizing. *See also* "Statistical Analysis of Chapter 11," an October 1989 unpublished paper written by Edward Flynn, management analyst in the Bankruptcy Division of the Administrative Office of the United States Courts (concluding that only 10% to 12% of Chapter 11 cases result in a successful reorganization).

■ Foreclosure would be accomplished by public auction, the only type of mortgage foreclosure sale permitted in Massachusetts. Mass.Ann.Laws ch. 244, § 14 (Law.Co-op.1986). Fixing a precise auction value is not simple. Foreclosure auctions are now being conducted in Massachusetts with more promotion and advertising than the minimum advertising required under the Massachusetts foreclosure statutes, as a result of bankruptcy decisions in this district requiring commercially reasonable sales efforts if the sale is to avoid the taint of a fraudulent transfer. *See General Industries, Inc. v. Shea (In re General Industries, Inc.,* 79 B.R. 124 (Bankr.D.Mass. 1987); *Ruebeck v. Attleboro Savings Bank (In re Ruebeck),* 55 B.R. 163 (Bankr.D. Mass.1985). An auction sale which is well publicized and properly conducted can, in theory, produce fair market value. It is nevertheless common knowledge that a real estate auction may be attended for the most part by parties who intend to purchase for the purpose of reselling at a profit, so that the price tends to be a wholesale price which reflects the anticipated profit. R. Jordan & W. Warren, *Bankruptcy* 512 (1989). This may be less true of a large investment property such as we have here. But other factors also come into play. Unlike the owner of property seeking full value from a sale, a foreclosing lender's prime economic motivation is to receive a bid sufficient to pay the mortgage. The number of buyers likely to be present at an auction, moreover, usually presents a thinner market than that which can be developed through private sales efforts. And an auction buyer typically has insufficient time to acquire enough information about the property to make a fully-informed bid, so that his offer is likely to take into account some uncertainty.

True, a mortgagee may become the winning bidder at the foreclosure auction, paying in whole or part through the setoff of his debt, and thereafter realize fair market value at a private sale. A first mortgagee may well be in a position to do this, so that fair market value is perhaps the appropriate standard where it is reasonable to expect a first mortgagee seeking adequate protection to bid in its debt and purchase at

**6**

the sale. As a second mortgagee, however, Sullivan would have to pay the Bank in full at foreclosure before being able to bid in his mortgage; it is unreasonable to expect him to do this. Indeed, in view of the Bank's relatively low mortgage balance as well as its serious financial problems and numerous troubled mortgage loans, it may well be unfair in the Bank's § 362 proceeding to consider its ability to bid in and resell.

Evidence was introduced on what a public auction would probably bring. I conclude that the property would sell at auction, net of all expenses, for 85% to 90% of its fair market value. Applying a median percentage of 87½ to the fair market value of $1,900,000 results in a sales price of $1,662,500, only slightly more than the $1,630,000 present total of the two mortgage debts. It will take about six months for Sullivan to complete the foreclosure process required under Massachusetts law, which would bring another six months' accruals of interest on the Bank's debt. That makes the present value of the Sullivan mortgage $72,000 less.

Sullivan's claim is therefore undersecured. Based upon the auction (or liquidation) value of $1,662,500 at the time of trial last month, his mortgage interest was then worth only $410,500 ($1,662,500 less the $1,252,000 due at foreclosure on the Bank's mortgage), and he then had an unsecured claim of $39,500. Although the Bankruptcy Code contains no express definition of what constitutes adequate protection of a property interest, the concept of lack of adequate protection is apparent. Adequate protection of a creditor's secured claim is lacking "to the extent that the stay ... results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1) & (2). The $410,500 value of Sullivan's secured claim will decrease further if the Bank's mortgage is allowed to accrue interest for more than another six months. His claim therefore lacks adequate protection. *In re Andrew J. Lane*, 108 B.R. 6 (Bankr.D.Mass.1989) (no lack of adequate protection due to absence of value cushion above secured claim where value of claim itself not decreasing);

*In re Chauncy St. Assoc. Ltd. Partnership*, 107 B.R. 7 (Bankr.D.Mass.1989) (same).

A separate order has issued modifying the automatic stay to allow Sullivan to foreclose unless within ten days from today the Debtor pays the Bank $39,500 (the amount of interest accrued on the Bank's debt which has reduced the value of Sullivan's secured claim as of last month from $450,000 to $410,500), plus $12,000 of interest accruing to the Bank for the month of September. If that is done, and if monthly interest on the Bank's debt continues to be paid, the value of the Sullivan mortgage will not decrease due to interest accruals.