In re LEDGEMERE LAND CORP., Ledgemere Condominium Corp., Greenhouse Acres Development, Inc., Marine Charter and Storage Ltd., Corp., Econdo Manufacturing Corp., H.A. Fafard & Sons Construction, Inc., and Howard A. Fafard, Debtors.

Bankruptcy Nos. 90–40962
thru 90–40968.

United States Bankruptcy Court,
D. Massachusetts.

March 8, 1991.

See also 116 B.R. 338.

Patrick Dinardo and Gayle Ehrlich, Sullivan & Worcester, Boston, Mass., for debtors.

Joseph Bodoff, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for First Nat. Bank of Boston.

Jean Darcey, Palmer & Dodge, Boston, Mass., for Lincoln Nat. Life Ins. Co.

Donald Tesiero, Burns & Levinson, Boston, Mass., for Anarpet Realty Corp.

Harold Murphy, Hanify & King, Boston, Mass., for Howard A. Fafard.

## OPINION

JAMES F. QUEENAN, Jr., Chief Judge.

Howard A. Fafard and his various business entities are developers and owners of commercial, industrial, and residential properties located throughout central and eastern Massachusetts. First National Bank of Boston (the "Bank") moves under 11 U.S.C. § 362 for termination of the automatic stay in order to foreclose mortgages covering properties in Salem, Reading, Medford, Bellingham, and Weymouth, Massachusetts. The Debtors Greenhouse Acres Development Corporation ("Greenhouse") and H.A. Fafard & Sons Construction, Inc. ("Fafard & Sons") move under 11 U.S.C. § 364 for an order (i) authorizing Greenhouse to grant liens with priority over the Bank's mortgage to subcontractors, suppliers, and Fafard & Sons to secure indebtedness not to exceed $500,000 for services and materials necessary to complete construction of a residential condominium project in Reading, Massachusetts known as the Reading Schoolhouse, and (ii) requiring the Bank to subordinate its mortgage on the property to documents to be recorded to establish the condominium. Ledgemere Condominium Corp. ("Ledgemere") and Howard A. Fafard ("Fafard") also move under 11 U.S.C. § 364 for an order authorizing them to grant to Haymarket Bank a mortgage with priority over the Bank's mortgage to secure loans not to exceed $3,000,000 for funds necessary to complete construction of a shopping plaza in Salem, Massachusetts known as Highlander Plaza. The Debtors offer additional security with respect to both § 364 motions.

Because the § 364 motions of the Debtors apply to property included within the Bank's § 362 motion, a consolidated evidentiary hearing has been held on all the motions. On February 13, 1991, I entered an order terminating the automatic stay with respect to the Bellingham mortgage and conditionally terminating the stay with respect to the Weymouth mortgage. The order continued the stay against foreclosure upon the Salem, Reading, and Medford properties. I also authorized the requested $500,000 priority liens for completion of the Reading Schoolhouse and the requested $3,000,000 priority mortgage for completion of Highlander Plaza. I found that the Debtors were unable to obtain the required credit and loans other than through liens priming the Bank's mortgage, and that the priority liens and mortgages, with the additional security, did not deprive the Bank of adequate protection. Because of the need for a speedy decision, I entered only general findings of fact and conclusions of law with the order, reserving jurisdiction to enter further, detailed findings of fact and conclusions of law. This opinion contains those further findings and conclusions.

## I. BELLINGHAM AND WEYMOUTH PROPERTIES

The property in Bellingham, which is owned by Fafard in his own name, consists of five parcels of about 120 acres, next to which is a tract of 200 acres under option to Fafard. The land is located near the intersection of Routes 495 and 126. Although Fafard has received a permit to construct a 425,000 square foot shopping center and industrial park on the property, he has commenced no construction. Nor does he have any lease commitments from third parties concerning the property. He has received only a purchase offer of $600,000 for an improved three-quarter acre portion used as a retail ski outlet. The Bank's mortgage debt on the property is $7,511,174.30, which includes interest accrued to the petition filing date of June 15, 1990. The Bank appraises the property at $2,335,000 on a fair market value basis and at $1,500,000 on a liquidation basis. Fafard concedes that the Bank's mortgage is far under water according to any valuation standard.

Fafard lays great importance upon the role that this property plays in the Town's master plan. He likens the land of a developer to a manufacturer's

raw materials whose value is enhanced during the manufacturing process. This property, he says, will increase in value as its development proceeds. The Bank contends that this and all real estate in Massachusetts is sharply declining in value, so that the Bank lacks adequate protection of its undersecured mortgage. That the Bank is undersecured does not mean it lacks adequate protection of its mortgage interest. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Adequate protection is lacking, however, when the automatic stay results in a decrease in the value of that portion of the claim which is a secured claim. 11 U.S.C. § 361 (1988); *In re Andrew J. Lane,* 108 B.R. 6 (Bankr.D.Mass.1989). Fafard does not contend otherwise. Nor does he dispute that Massachusetts real estate has generally declined in value during the last year or more.

■ There are flaws and strengths to the Bank's argument. Although there has been a market decline during these chapter 11 proceedings, it cannot yet be said with technical accuracy that the stay "results in" a decrease in value of the Bank's mortgage interest. This phrase presumably requires a decrease in value of the secured claim which would not have taken place absent the stay. The Massachusetts foreclosure procedure consumes about seven months, which is about the age of these proceedings. So, even in the absence of the chapter 11 filing and the stay, the Bank would just now be able to sell the property. Most important, the recent market decline does not mean that it will necessarily continue. We may be at the nadir. No prediction concerning the real estate market's direction can be made with any degree of certainty. Nevertheless, present economic conditions do present a substantial possibility that the decline will continue. Absent any offsetting considerations, I conclude that this possibility would deprive the Bank of adequate protection. The question is therefore whether Fafard's development plans present an equally substantial possibility of value enhancement which at least

balances the danger of decline posed by present market conditions.

No party has as yet expressed interest in occupying space in the proposed retail and industrial park. The Debtors have no specific construction plans; the start of the project appears years away. I conclude that the Debtors' development plans are too embryonic to outweigh the very real danger of a further market decline, so that the Bank lacks adequate protection of its mortgage interest.

■ The Weymouth property presents much the same situation, even though the value of the property and the balance of the mortgage debt are much closer to being equal. The Bank's mortgage debt here is about $1 million. The property consists of 3.5 acres of commercially zoned land with frontage on Route 3A in the west and extending in a slope in the east to a bay on the Atlantic Ocean. In the front portion on Route 3A is a vacant building which previously housed a car dealership. The owner, Fafard & Sons, would raze the building, subdivide the front portion into three parcels, bring in fill to raise the land to street level, and construct buildings for retail use. Here again, there are no commitments from would-be occupants and no specific construction plans. Nor does the location present particularly bright retail opportunities. Being on the easterly side of Route 3A, commuters returning south from Boston in the evening would have to turn left across the center line in order to gain access. Not even retail establishments on the opposite, more preferable, side of the street have fared very well.

■ The Metropolitan District Commission ("M.D.C.") is interested in the property because of the water frontage; it has offered to purchase the entire parcel for $1.1 million. Although the Debtor's appraiser testified to a value of $1.3 million, I find that the M.D.C. offer of $1.1 million represents the property's fair market value. Because Fafard & Sons does not wish to sell the property, the Bank's mortgage is worth only what it will bring at foreclosure, which would likely be no more than ninety percent of fair market value.

*In re Robbins,* 119 B.R. 1 (Bankr.D.Mass. 1990). With unpaid taxes of $33,032.98 constituting a senior lien, a foreclosure would bring the Bank less than its $1 million debt. The Bank is therefore undersecured. As is the case with the Bellingham property, the danger of a decline in value of its mortgage interest due to market conditions is not outweighed by the possibility of an enhancement in value through the Debtor's development of the property. The Debtor's development plans are visionary when compared to the reality of the present market.

## II. READING AND SALEM PROPERTIES

The Reading and Salem properties present a different picture due to the advanced stage of their development and the Debtors' offer of additional security.

■ The Reading Schoolhouse is a former school building of an historic and distinctive design. Greenhouse has converted the structure into a condominium of forty residential units. Some units have one bedroom and some two bedrooms plus a loft. Very little remains to be done to complete the project—principally the installation of elevators. The asking prices for the units vary from $100,000 to $200,000. Three are under purchase and sales agreements, and five more are subject to reservation deposits. Although the condominium market in Massachusetts is generally weak due to over-building, the market in Reading is relatively strong for this type of project.

■ The fair market value of the property is $4 million. Because of the Debtor's sales plans, fair market value rather than liquidation value is the appropriate standard for valuing the Bank's mortgage interest. *In re Robbins, supra.* The Bank's debt slightly exceeds $4 million, so that here again the Bank is undersecured. Although there is a pre-petition real estate tax lien, the Debtor is paying post-petition taxes.

I find that the chance of a decline in the value of the property is more than offset by the likelihood of enhancement in value due to the Debtor's construction and marketing plans. Completion of the building will increase its value by more than the requested $500,000 expenditure. Fafard, moreover, has offered additional adequate protection in the form of a $250,000 guaranty of payment by his wife which is sufficiently secured to be worth $250,000. With all of these factors in mind, I conclude that the Bank has adequate protection of its mortgage interest with respect to both its § 362 motion and the Debtor's § 364 motion.

■ Highlander Plaza in Salem is in the midst of construction. Two anchor tenants are in place, both of whom are members of successful chains—CVS Drugs and Shaw's Supermarkets. The rest of this one existing building is occupied by J.C. Penney and Jenny Craig, who signed leases after the chapter 11 filings. The building comprises about 94,892 square feet. Fafard holds an option to purchase an adjacent 1.2 acres; he plans to construct a building partially on the property now owned and partially on the property under option. He would like to construct 42,960 square feet of new space and finish 21,120 of incomplete construction, thereby adding a total of 64,080 square feet to the present 94,892 square feet of finished space, an increase of about sixty-eight percent.

Leases have also been signed with G & M Cleaners and Lighthouse Restaurant. Draft leases are the subject of negotiations with the Carvel Ice Cream, Tony Lena, Stacy's Shade Shop, and Taco Bell. The Debtors have had discussions with the McDonald's and Ground Round restaurant chains. All of these negotiations have been hampered by uncertainty over the financing necessary to complete the project. Most of the new construction will be on so-called "out-parcels" which have visible locations on Highland Avenue with access directly from the street as well as from the shopping center. A shell of a building has already been constructed on one site.

Highlander Plaza is particularly well located. Highland Avenue is a heavily traveled thoroughfare and Highlander Plaza is only a few miles from the center of Salem.

Immediately next to it is another shopping center, known as Hawthorne Shopping Center, whose major tenants include Caldor, Radio Shack, another supermarket, and a chinese restaurant. The patrons of each center have easy access to the other, thus increasing the draw of both. Behind the plaza is a 300 unit condominium complex built by Fafard.

The original construction loan agreement with the Bank called for a loan of $14,300,-000, of which the Bank has advanced about $11,600,000. The $3 million which the Debtor now seeks authority to borrow is therefore largely the balance of the original construction financing. Haymarket Bank will advance funds to build or complete a structure only if lease commitments are in hand for fifty percent of the space. The Bank's debt, including interest accrued to the petition filing date, is about $12 million. It is subject to a pre-petition real estate tax lien of almost $300,000. The Debtor is paying post-petition taxes. Both parties agree that the Bank is undersecured. The Debtor's appraiser opines at a $10,640,000 fair market value; the Bank's appraiser believes the property is worth $11,700,000. Both agree that the highest and best use of the property is as a completed shopping center. The only objection that the Bank's appraiser has to completion of construction is that he thinks it should be done later when the real estate market improves.

This project demands completion now. The planned construction will increase the property's value by about twice the $3 million construction cost. This alone provides the Bank with adequate protection for the $3 million priming mortgage of Haymarket Bank. Over and above this, the Debtors have offered a $1.5 million secured guaranty of Mrs. Fafard which I find is worth its $1.5 million face amount. These values greatly outweigh the possibility of any short-term decline in the value of the property due to market conditions.

In sum, business and common sense dictates completion of the Reading and Salem projects. No units whatsoever can be sold in Reading without installation of eleva-tors. The planned new construction in Salem will be a perfect compliment to the existing building there.

The Bank relies upon decisions denying priming liens in circumstances far different from those present here. For example, in *In re First South Savings Associates*, 820 F.2d 700 (5th Cir.1987), the debtor sought authorization for a priming lien to "convert" a building initially intended for offices (and fifty percent constructed) to a "hotel/convention center" which would be operated on a "consolidated basis" with a nearby hotel and garage owned by affiliates of the debtor. No evidence was offered of the feasibility of such an enterprise or of the terms under which the various operations would be consolidated. In *In re St. Petersburg*, 44 B.R. 944 (Bankr. M.D.Fla.1984), the debtor wanted priming liens to secure funds for renovation of an old hotel. An investor required that improvements be made by a specific date; even if completed by then, losses were projected for two years. Unlike the Reading project, neither of these cases involved construction of the very final stage of a project. And unlike the Salem project, there were no anchor tenants in place and no requirement that fifty percent of a building's space be subject to lease commitment before construction funds are advanced.

## III. MEDFORD PROPERTY

■ The Medford property is the old Medford High School, which in 1983 Fafard & Sons converted into 111 residential condominium units. The building was rented for five years in order to obtain certain tax advantages available for historic buildings. Having discovered that the rental cash flow is insufficient, the Debtor plans to sell all the units. It has sold twelve units since 1988. The building is now eighty-five percent occupied.

The Bank is far under water in Medford. Shawmut Bank, N.A. ("Shawmut") holds a first mortgage loan with a balance of $5,540,000; there is also a pre-filing real estate tax lien of $110,000. The Bank's second mortgage was around $4,775,000 as

of the petition filing date of June 15th. The appraisers for both parties agree that the property's liquidation value is only $6 million, which would leave less than $400,000 for the Bank. In order to assure the Bank that its second mortgage interest will not suffer further erosion through accrual of interest on the senior Shawmut debt, the Debtors have entered into an agreement with Shawmut requiring payment of monthly interest commencing in January and giving Shawmut additional security for the interest which had accrued before then.

The planned program of selling each unit after expiration of its lease is the property's highest and best use. Under that program, the property's fair market value is $8 million, and the Bank's mortgage is worth about $2.4 million. This is far more than its $400,000 liquidation value. We have here a situation where the enhancement in value of the Bank's mortgage, from liquidation value to fair market value, through the Debtor's marketing program provides adequate protection against any possible decline in the liquidation value of the mortgage due to a declining market. This is so because the Bank would not participate in this excess value after foreclosure. If Shawmut or the Bank were to foreclose, Shawmut would likely be the successful bidder through its ability to bid in its $5.54 million debt. The Bank would realize only liquidation value, presumably about $400,000. Shawmut or its later buyer would presumably continue the process of selling units as leases expire. In that fashion, Shawmut, but not the Debtor or the Bank, would participate in the excess of fair market value over liquidation value.

Only through the Debtor's present sales program, therefore, is it likely that the Bank can realize the fair market value of its mortgage. That enhanced value of about $2 million is adequate protection; it far outweighs any threat of a short term decline from current market conditions.

## IV. NECESSITY OF PROPERTY TO EFFECTIVE REORGANIZATION

Because the Debtors have no equity in the Salem, Reading, and Medford properties, the Bank would be entitled to relief from the stay against foreclosure on these properties if they are "not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2) (1988). This means that not only must the property be necessary to a Debtor's reorganizational efforts, but also that there must be a reasonable possibility of a successful reorganization within a reasonable time. *United States Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 375–76, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988).

The Bank contends that the Debtors' reorganization, visionary and unrealistic though it may be, does not depend upon any of these three properties. Surely the necessity test means more than this. Otherwise, in a large and complex real estate case such as this, each property could be viewed to be as dispensable as individual items in a manufacturer's inventory; under that reasoning, the Debtors' entire inventory of real estate could be foreclosed upon. Each of the Debtors' real estate holdings should be viewed as part of the whole so long as the nature of the property lies within the core of the Debtors' operations. The Debtors' core operations encompass construction and sale of residential real estate, such as the Reading and Medford properties, and construction and ownership of commercial properties such as the Salem project.

The Bank focuses its main attack on the Debtors' ability to reorganize. It stresses the language in *Timbers* which requires that a reorganization be "in prospect," *Timbers* at 375–76, 108 S.Ct. at 632, intimating this means that a chapter 11 plan must be on file and have a probability of success. The Bank ignores the more illuminating statement in *Timbers* which interprets § 362(d)(2) to require only that there be "a reasonable possibility of a reorganization within a reasonable period of time." *Id.* The Debtors are not required at this stage to show the probability of a successful reorganization or that their plan on file is confirmable. *In re Peter W. Wasserman*, 122 B.R. 839 (Bankr.D.Mass. 1991); *In re Terrace Gardens Park Part-*

*nership,* 96 B.R. 707, 712 (Bankr.W.D.Tex. 1989).

The Debtors filed a joint plan of reorganization on November 6, 1990. No disclosure statement has received court approval, so that the Debtors have not yet formally solicited acceptance of the plan. The plan requires that each secured creditor have its claim presently valued; any future increase in value would be shared between the creditor and the Debtors. The unsecured portion of any partially secured claim would be placed in one class with all unsecured claims. These claims would receive a maximum dividend of fifty percent. Each class would be paid from what the plan refers to as "Excess Available Cash"; payments would also be made under a six year convertible, subordinated, noninterest bearing note. Of the twenty-nine classes of creditors included within the joint plan, eight classes have informally indicated their willingness to accept it.

The Bank treats the present question under § 362(d)(2) as though this were a confirmation hearing on the Debtors' joint plan. It of course is not. That plan may be amended several times before it is formally proposed or confirmed. What is subject to scrutiny here is the Debtors' general ability to reorganize, not whether any particular plan will be confirmed. Moreover, even if we focus upon the joint plan on file, the Debtors need not demonstrate that the plan meets the requirements of § 1129, only that there is a reasonable possibility of it doing so.

I conclude that there is a reasonable possibility of the Debtors successfully reorganizing within the next year, and that this is so even with respect to the joint plan now on file. Indications of acceptance by eight of twenty-nine classes of creditors point in the right direction. What the final position of the various classes will be is of course unknown. Compared to the Bank, however, the other creditors have been relatively cooperative with the Debtors. There is thus some reason to be sanguine about creditor acceptance. It is immaterial that Fafard proposes to maintain an ownership interest without a fresh contribution of capital. No such contribution will be necessary if the plan is accepted by the class of unsecured claimants. 11 U.S.C. § 1129(a) (1988). It appears that the Bank's unsecured claim will not control that class. The interest rate on the note proposed in the plan for the Bank's Salem mortgage is not determinative; the court will establish that rate. Nor can the Debtors' plan fix liquidation value as the standard for valuation of the Bank's various secured claims. That standard will be established by the court. 11 U.S.C. § 506(a) (1988). In view of the Debtors' marketing efforts on the Reading and Medford properties, fair market value would appear to be the appropriate valuation standard in a cramdown of these mortgage interests. Finally, it is not necessary for the Debtors to establish at this stage that their plan is feasible. At most, they need only propose a plan that is not patently infeasible. They have done so.

## V.  CONCLUSION

The Bank has adequate protection with respect to its Salem, Reading, and Medford mortgages. The Debtors' planned development of the Weymouth and Bellingham sites, on the other hand, is too nebulous to provide the Bank with adequate protection in light of present market conditions.