**In re DEMAKES ENTERPRISES, INC., Debtor.**

**Bankruptcy No. 91–12666–JNG.**

United States Bankruptcy Court, D. Massachusetts.

June 22, 1992.

---

Joan N. Feeney, Hanify & King, Boston, Mass., for debtor.

James M. Liston, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for the FDIC (movant).

JAMES A. GOODMAN, Chief Judge.

## I. PROCEDURAL BACKGROUND

Demakes Enterprises, Inc. ("Demakes" or "Debtor") filed a voluntary Chapter 11 petition on March 29, 1991. Since that date, Demakes has operated its meat products manufacturing and distribution business as a debtor-in-possession. On August 27, 1991, the FDIC filed a Motion for Relief from Stay, seeking to foreclose on its first and second mortgages on Demakes' plant in Lynn, Massachusetts, and to repossess Demakes' equipment subject to its security interest. In the alternative, the FDIC sought an order for adequate protection.

Demakes filed an opposition to the FDIC Motion. It did not dispute the lack of equity in the FDIC's collateral but contended that it could provide the FDIC with adequate protection for its interest in the collateral. The Debtor further alleged that the property in which the FDIC has an interest is necessary for an effective reorganization of its financial affairs which is in prospect. Demakes filed a Plan of Reorganization and Disclosure Statement on October 29, 1991.

This Court held evidentiary hearings on the FDIC Motion on December 16, 1991, and January 6, 1992. At the conclusion of the evidentiary hearings concerning the valuation of the plant in Lynn, the Court encouraged Demakes and the FDIC to reach an agreement on monthly cash payments constituting adequate protection. The parties stipulated that Demakes would make monthly payments of $12,000 as adequate protection, pending the hearing on confirmation of the Debtor's Plan of Reorganization. On January 7, 1992, the Court entered an adequate protection order, incorporating the parties' stipulation and took under advisement the valuation of the FDIC's security interest.

## II. POSITIONS OF THE PARTIES

The parties disagree on the valuation standard that the Court should apply in determining the value of the property in question. The Debtor argues that the liquidation value should apply while the FDIC argues that the Court should use the fair market value.

In asserting its position that the Court should apply the fair market value standard, the FDIC states:

> Courts will apply a "fair market value" standard in valuing specific assets which constitute a secured creditor's collateral where the debtor proposes to remain in business and retain those assets along with its other assets under a plan of reorganization. Generally, the fair market value of real estate or equipment in the context of an ongoing operation will be its resale or replacement value, premised on the basis of its sale or use in an ongoing business.

FDIC memo at 6. In support of its position, the FDIC cites the following cases in which courts discussed valuation issues in the context of relief from stay motions: *In re Automatic Voting Machine Corp.*, 26 B.R. 970, 972 (Bankr.W.D.N.Y.1983) ("the appropriate method of valuation to gauge whether [a creditor] is adequately protected in a reorganization case is the 'going concern' or fair market value."); *In re*

*QPL Components, Inc.,* 20 B.R. 342, 344 (Bankr.E.D.N.Y.1982) ("the value to be accorded collateral which is inventory of an ongoing Chapter 11 debtor, with reasonable prospects that it can continue, is the dollar value realizable from its disposition in the ordinary course of business"); *In re Shockley Forest Industries,* 5 B.R. 160 (Bankr.N.D.Ga.1980) ("Because Debtor is a going business concern with reasonable prospects for rehabilitation, the proper standard of valuation of the collateral herein is the fair market value."); *In re American Kitchen Foods, Inc.,* 2 B.C.D. 715 (Bankr.D.Me.1976). The FDIC further asserts that 11 U.S.C. § 506, which states that the determination of value of collateral is to be made "in light of ... the proposed disposition or use" of the property in question, mandates use of the fair market value standard when confirmation is in the offing.

Demakes asserts that the test used to determine the allowed amount of a secured claim under section 506 in a Chapter 11 case is the liquidation standard, unless a sale of the business as a going concern is contemplated. Demakes urges the Court to consider that a debtor's ongoing operation of its business should not increase the value that is set for that business, since what is actually evaluated ought not to be the property itself but the creditor's interest in that property. Since the secured creditor would have to foreclose or otherwise liquidate the property, the costs to accomplish that end should be a factor in any valuation process. *See In re Robbins,* 119 B.R. 1 (Bankr.D.Mass.1990) (in context of relief from stay motion, security interest is worth what it will bring at commercially reasonable foreclosure, and foreclosure costs are proper deductions); *In re T.H.B. Corp.,* 85 B.R. 192 (Bankr.D.Mass.1988) (in context of use of cash collateral, where no sale of debtor's assets is in prospect, value ascribed to collateral is the liquidation and not going concern value); *In re Conquest Offshore International, Inc.,* 73 B.R. 171 (Bankr.S.D.Miss.1986) (liquidation value is more appropriate standard than fair market value for collateral for which there exists no normal market).

## III. VALUATION STANDARDS

The Bankruptcy Code directs the Court to determine a property's value "in light of the purpose of the valuation and of the proposed disposition or use of the property...." 11 U.S.C. § 506(a). Not surprisingly, a systematic method for valuing collateral has not evolved, due to Congress' intention that valuations be made on a case by case basis. S.Rep. No. 989, 95th Cong., 2d Sess. 54, U.S. Code Cong. & Admin. News pp. 5787, 5840 (1978) ("Courts will have to determine value on a case by case basis, taking into account the facts of each case and the competing interests in the case"). *See* D.G. Carlson, *Secured Creditors and the Eely Character of Bankruptcy Valuations,* 41 Am.U.L.Rev. 63, 64 (1991) ("Not surprisingly, bankruptcy courts have indeed gratified the wishes of Congress by producing an extremely diverse and contradictory set of valuation theories.") This mandate to make new decisions regarding valuations with each case is further complicated when one realizes that the "value" ascribed to collateral is little more than a "shadow," J.F. Queenan, Jr., *Standards for Valuation of Security Interests in Chapter 11,* 92 Commercial L.J. 18 (1987), or an estimated prediction of the price the property would bring at a future auction. D.G. Carlson, *Unsecured Claims Under Bankruptcy Code Sections 506(a) and 1111(b): Second Looks at Judicial Valuations of Collateral,* 6 Bankr. Dev.J. 253, 263 (1989). The latter commentator noted, "[u]nless the collateral is highly fungible and stable in price, valuations are inherently uncertain...." *Id.*

In this case, the property is being valued for the purpose of the FDIC's Motion for Relief from Stay, or in the Alternative for Adequate Protection, although the Court notes that the parties necessarily must be concerned about valuation in the context of a confirmation hearing with respect to the plan of reorganization on file. The FDIC, as an undersecured creditor, who is entitled to protection against depreciation of the value of its secured position, but not interest, is pressing the Court to place a high

value on the property, while the Debtor is advocating a low value. While a Debtor usually presses for a high value at this stage in the proceedings in order to claim that it has some equity in the property, since there is admittedly no equity in the property, Demakes appears motivated by an effort to minimize adequate protection payments, presumably to increase its cash flow. Additionally, as has been just noted, both parties must be looking ahead to confirmation, where a low value may assist the Debtor's confirmation attempts, while a high value will give the FDIC a greater secured claim and a potentially greater return.

The Court is persuaded that the standard set forth by Judge Queenan in several recent decisions is the correct one to use in the context of this case. *See, e.g., In re Robbins*, 119 B.R. 1, 5 (Bankr.D.Mass.1990) (where there is no "proposed disposition" of the property and the debtor intends to retain it, "there is no reason to depart from the general rule that a mortgage interest is worth what it will bring at foreclosure"); *In re T.H.B. Corp.*, 85 B.R. 192, 195–196 (Bankr.D.Mass.1988) (the value that the creditor is likely to obtain from the collateral in a commercially reasonable foreclosure sets the proper standard for valuation); *In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr.D.Mass.1991) (fair market value was applied to condominiums because the market was relatively strong for those properties, several sales were being finalized, and the creditor was not likely to incur costs in selling the properties). In an article on this issue, J.F. Queenan, Jr., *Standards for Valuation of Security Interests in Chapter 11*, 92 Commercial L.J. 18 (1987), Judge Queenan summarized the standard for valuing properties in Chapter 11 proceedings:

> [W]ith this exception [where the debtor itself plans to sell the collateral], the proper standard for valuation of security and mortgage interests should be the value obtainable through a disposition by the secured creditor which is the most commercially reasonable disposition under the circumstances....

*Id.* at 20. Accordingly, the Court holds that the use of such a standard for resolving issues in the context of relief from stay and adequate protection motions is the correct one. Moreover, in the context of this case, the use of this standard is appropriate for confirmation purposes as well. However, if a disposition of property is proposed or thriving market conditions exist, this Court would consider using a fair market value for confirmation purposes. Those conditions are not present here.

In the present case (where there exists a spread of almost $3 million between the fair market value advocated by the FDIC's appraiser and the liquidation value advocated by the Debtor's appraiser), the Court is convinced that use of the fair market value standard would be unjustified. The fair market value is an artificial, theoretical estimate of what a willing buyer in an open market will pay for property, and what a willing seller will accept. In this case, the owner of the property is not a willing seller, as principals of Demakes hope to keep the property, which has been a family-owned business for decades. The only foreseeable way this property will be sold, if it is to be sold at all, will be through foreclosure by the FDIC. Furthermore, no reasonably ready market exists for this type of property. The parties have agreed, and their respective appraisers have testified, that the real estate market, particularly for food processing plants, is very poor, and it could take two to three years to sell the property, absent a foreclosure sale by the FDIC at a reduced price. With these factors in mind, and given the depreciating real estate market, the Court reiterates its determination that fair market value is an inappropriate standard for resolving the adequate protection motion before the Court, and that such a standard would be inappropriate for confirmation purposes, as well.

## IV. THE PROPERTY AND THE APPRAISAL REPORTS

■ The Court received as evidence three appraisal reports. The FDIC submitted the appraisal report of John A. Regan ("Regan"), dated June 7, 1991, and the

Debtor submitted the appraisal report of Charles W. Anderson, Jr. ("Anderson"), dated October 21, 1991. The parties stipulated to the admissibility of the appraisal report of Nicholas S. Haddad ("Haddad"). Haddad's report was prepared in August of 1990 for the Bank of New England. Regan and Anderson testified at the hearings as to the contents of their respective reports, and Haddad did not.

The appraisers and the parties agree on several relevant facts regarding the property. The property consists of approximately 70,000 square feet of land, containing a building which houses the Debtor's meat processing activities and another, smaller building formerly used as a gas station. The main building has two floors above ground, with a total of about 50,000 square feet, and a basement with about 18,000 square feet. The basement is effectively divided into two portions, an eastern portion with approximately 4,000 square feet, and a western area with approximately 14,000 square feet. The basement is broken up by an array of posts that limit mobility. The ceilings are only seven feet high in many places, creating a feeling, in the words of one appraiser, of walking through the chambers of a submarine.

Due to the disjointed layout of the building, it is not an ideal site for a meat processing plant. Additionally, the location in Lynn, Massachusetts, is not conducive to a meat processing plant. The site of the plant provides limited access to major highways and railways. The streets in the neighborhood of the plant are narrow and limit truck access. Despite these problems, the appraisers are in agreement that the Debtor has adapted the building so that it now fits the Debtor's needs. The appraisers also agree that the best and highest use of this building is indeed as a meat processing facility.

Regan used both the comparable sales approach and the income approach in his appraisal report. He concluded that the fair market value of the property was $4.07 million, as of the date of his appraisal report.

The Debtor points out flaws in Regan's appraisal. According to the Debtor, Regan's appraisal fails to give sufficient weight to the location of the meat plant as a negative factor, and glosses over the problems of transportation and access. Additionally, the Debtor criticizes Regan's appraisal for failing to address the severely depressed condition of the real estate market in Lynn. The Debtor argues, and the Court agrees, that it is unlikely that an existing meat processing business would buy this property with the intention of relocating to Lynn. Furthermore, a new business would most likely choose to locate in the meat packing district of Boston, where access to highways and railways is much better than in Lynn. In view of these deficiencies, the value ascribed to the property by Regan is unacceptably high.

The Debtor also points out that, in applying the sales comparison approach, Regan compared several properties that were listed for sale but had not yet actually been sold. In using the prices of these listings, Regan failed to account for the fact that the actual sales price might be considerably less than the listing price. Such a deduction is warranted.

Finally and most importantly, the Debtor criticizes Regan's valuation for failing to take into account the costs of selling the property or of holding and maintaining it until the time of such sale. Regan did provide a "fair value" for the property of $3.135 million in which he did consider such costs. He defined fair value as

> the cash price that might reasonably be anticipated in a current sale under all conditions requisite to a fair sale. A fair sale means that buyer and seller are each acting prudently, knowledgeably and under no necessity to buy or sell—i.e., other than in a forced or liquidation sale.

However, his fair valuation is questionable since Regan conceded that a sale was not likely to occur for two to three years, yet his "fair value" only represented deductions for one years cost.

The Debtor's appraiser, Anderson, concluded the property had a fair market value of $2.975 million, and a liquidation value of

$1.44 million which the Debtor argues more accurately reflects the value of the property. Anderson arrived at the $1.44 million number by taking 66.7% of the fair market value after adjusting that value for marketing and sales expenses over a two year period.

The primary drawback to Anderson's appraisal is that Anderson completely disregarded the basement area of the plant, consisting of approximately 18,000 square feet of space. The western portion of the basement contains spice rooms, a freezer, storage areas, a grease trap, locker rooms, a boiler room, a maintenance area and an employees' lunchroom. The eastern portion of the basement has been more recently constructed and contains a meat cutting room, a storage area, a refrigeration machine room, an electric room and a meter room. The Court heard evidence that the basement areas are currently being used in the debtor's business, and that the facilities in the basement are necessary to a meat processing plant and are required by the U.S. Department of Agriculture. If these facilities were not in the basement, they would have to be located elsewhere in the building.

The FDIC also argues that Anderson's appraisal report confuses and misuses the terms "market value," which represents the fair market value of the property, and "discounted value," which represents the value of the property minus costs of sale. The FDIC points to sections of Anderson's appraisal report where Anderson begins analyzing the market value and then substitutes the discounted value numbers. Additionally, the FDIC argues that Anderson's appraisal contains too many small, miscellaneous deductions which compound each other to create a liquidation value that is too low to be accurate.

With respect to the Haddad appraisal, the parties stipulated to its admission. In their respective briefs, the parties said little about Haddad's appraisal. For example, the FDIC focused on the fact that Haddad used only the income approach, and not the comparable sales approach, and that the properties Haddad used as comparables for rental income were fish processing plants and not meat processing plants. The Court is not persuaded that these factors seriously undermine Haddad's conclusions. Moreover, Haddad at least recognized the "scarcity of truly similar land sales" and the "lack of truly comparable improved sales in Lynn or any of the nearby, similar communities." The Debtor noted several instances where the Haddad and Anderson appraisals were congruous. Specifically, Haddad, like Anderson, ascribed no value to the basement area, while noting that the basement area is factored into the overall rental rate. Haddad used the income approach to approximate the potential income the property could bring in, and then capitalized that value to reach the theoretical value of the entire property. Haddad concluded that the fair market value of the property was $2.92 million and the "fair value," after taking deductions for sales expenses and a marketing period of 18 months (the period of time it would take to sell the property in excess of one year), was $2.26 million. Haddad defined fair value the same way Regan did.

The Court is satisfied with Haddad's fair market value of $2.92 million. Given the depreciating real estate market, Haddad's fair market value gives credence to Anderson's fair market value, as the spread between the two values is less than $50,000. It is inconceivable to this Court that the property could have appreciated in value between August of 1990 and June of 1991. Even if Haddad underestimated the fair market value of the property by twenty percent, and the fair market value of the property was actually in excess of $3 million in August of 1990, there is simply no way the Court can accept Regan's valuation of the property less than one year later at $4.07 million. Thus, the Court accepts the Debtor's appraiser's estimate of the fair market value of $2.975 million. Using this figure as a starting point, the Court can then estimate the actual value of the FDIC's lien. *See Robbins,* 119 B.R. at 6.

As noted above, the only method by which the FDIC will collect on its security interest is through foreclosure of the prop-

erty and sale at a public auction, in accordance with state law. In *Robbins,* the court determined that, based upon evidence it received, sale at a public auction likely would bring 85% to 90% of the fair market value of the property. Considering the negative factors surrounding the Debtor's property in Lynn, and the testimony that a liquidation value is usually ⅔ of the fair market value, the Court believes that a sale of this property would bring less than 85% to 90% of the fair market value of the property. Nevertheless, in light of *General Industries v. Shea (In re General Industries, Inc.),* 79 B.R. 124 (Bankr.D.Mass. 1987), and *Ruebeck v. Attleboro Savings Bank (In re Ruebeck),* 55 B.R. 163 (Bankr. D.Mass.1985), foreclosure auctions in Massachusetts are being conducted with more promotion and advertising than state law requires. Accordingly, it is unlikely that the value obtained from an auction sale would be less than 70% of the fair market value. The Court, therefore, is unable to accept the testimony of the appraisers to the effect that the property would be sold for ⅔ of its fair market value at an auction. Accordingly, the Court will discount the fair market value by 70%. The Court will not reduce the fair market value to reflect a two year marketing period before applying the discount factor, since the whole purpose of an auction sale is to dispose of property expeditiously.

In view of the foregoing, the Court concludes that the value of the FDIC's lien entitled to adequate protection against the depreciation in value of the real property is $2.08 million. The FDIC has a total secured interest entitled to protection of $2,746,675, when the stipulated liquidation value of the personal property subject to the FDIC's lien is added to the amount of the mortgage lien.

The foregoing constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. An appropriate order shall issue.