**In re FUND RAISER PRODUCTS CO., INC., Debtor.**

**Bankruptcy No. 92–17888R.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 8, 1994.

Keith Leonard, Leonard, Tillery & Davison, Philadelphia, PA.

Vincent J. Marriott, III, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA.

Kerry S. Schuman, Jaffe, Friedman, Schuman, Nemeroff & Applebaum, P.C., Elkins Park, PA.

Scott N. Schreiber, Much Shelist Freed Denenberg & Ament, P.C., Chicago, IL, for Giftco, Inc.

Frederic J. Baker, Asst. U.S. Trustee, Office of U.S. Trustee, Philadelphia, PA, for U.S. Trustee.

## *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

Before the Court is the Motion of Ruth Segal ("Ruth Segal") for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) to permit her to liquidate certain stock in a company known as Giftco, Inc. ("Giftco"). The Stock in question is owned by the *Debtor* and is alleged by *Ruth Segal* to serve as collateral for Ruth Segal's prepetition loans to the Debtor. The motion is opposed by the Official Committee of Unsecured Creditors (the "Committee") which challenges the perfection of Ruth Segal's security interest in the Giftco stock, and by an entity known as VSA, Inc. ("VSA"), on whose behalf successor counsel for the Committee filed a response to the Ruth Segal motion which mirrors the response filed by the Committee on its own behalf. In addition, an answer in opposition to the 362(d) motion was filed on behalf of the Debtor, although counsel for the Debtor has advised the Court that the Debtor views itself mainly as a "stakeholder." The Debtor's opposition to the motion in actuality appears nominal.

A hearing was held on January 12, 1994. The Court has concluded that the movant, Ruth Segal, has established the validity of a claim against the Debtor secured by the Giftco stock, and has sustained the Movant's burden under 11 U.S.C. § 362(g) of establishing that there is no meaningful equity in the Giftco stock. The Debtor is a non-operating company and no reorganization of its affairs is contemplated. The Court, accordingly, concludes that grounds exists to modify the automatic stay as to Ruth Segal under both Section 362(d)(1) and 362(d)(2).

## *BACKGROUND*

The Debtor, Fund Raiser Products Co., Inc. is a company that was, in the past, apparently engaged in the business of selling fund raising products to various institutional and charitable groups for their own fund raising projects. In 1991, while still in business, the Debtor was party to a certain line of credit lending relationship with Continental Bank ("Continental").

In July of 1991, the Debtor requested that Continental expand the limits of its existing line of credit to $625,000, and Continental agreed to do so provided the Debtor 1) obtain an additional cash infusion from another source and 2) furnish Continental with additional collateral. The pre-existing credit facility between the Debtor and Continental was apparently already secured, *inter alia*, by a pledge of certain securities co-owned by Ruth Segal and the Estate of Isadore Segal, a/k/a George S. Segal, deceased (the "Estate").

Concurrently with the extension of the Continental financing in July 1991 and, as noted, as a condition to Continental's willingness to consummate that loan transaction, Ruth Segal, the mother of the Debtor's President, loaned to the Debtor the sum of $120,-000. In turn, the Debtor pledged its Giftco stock to both Continental, and to Ruth Segal and the Estate. The Ruth Segal loan is evidenced by a Promissory Note (the "Ruth Segal Note") dated July 1, 1991 in the face amount of $120,000. A copy of the Ruth Segal Note has been admitted in these proceedings as Exhibit A–1. As security for repayment of its obligations under the Ruth Segal Note, and to secure its obligations under a separate Indemnity Agreement executed by the Debtor in favor of Ruth Segal and the Estate, the Debtor also executed a Pledge Agreement (the "Pledge Agreement") in favor of Ruth Segal and the Estate. A copy of the Pledge agreement has been admitted as Exhibit A–2. Pursuant to the terms of the Pledge Agreement, Ruth Segal and the Estate were given a security interest in the Giftco stock which was to be junior only to the senior security interest therein concurrently being given to Continental.

Certain terms of the agreement between the Debtor, Continental, Ruth Segal and the Estate with respect to the relative lien priorities of Continental, Ruth Segal, and the Es-

tate, in the Giftco stock are set forth in a separate agreement. (the "Intercreditor Agreement"). A copy of the Intercreditor Agreement has been admitted as Exhibit A–3.[1] The Intercreditor Agreement itself also references a still further written Subordination Agreement by and between Ruth Segal, the Debtor and Continental (the "Subordination Agreement"), however, no copy of that document was offered into evidence. There is no seeming dispute that any indebtedness owned by the Debtor to Ruth Segal was, in fact, entirely subordinated to the debt owed to Continental.

The Intercreditor Agreement recites that the Giftco stock, which was simultaneously being pledged to Continental and Ruth Segal, would be physically held by Continental to perfect the parties' respective security interests in that stock. Paragraph 8 of the Intercreditor Agreement goes on to provide:

> Notwithstanding anything contained to the contrary above, if at any time Segal desires that Continental release its security interest in the Shares and deliver the certificates representing the Shares to Segal and the Estate, Segal shall first cause a payment of $60,000 to be made to reduce the outstanding liability of Fund Raiser under the Continental Loans. Continental shall apply such payment to such loans as Continental in its sole discretion shall determine. Additionally, simultaneously with the $60,000 reduction of Fund Raiser debt, Continental shall reduce by $60,000 the total funds available to Fund Raiser under one or more of the Fund Raiser lines of credit. Continental shall decide in its sole discretion which credit lines to reduce. Upon such payment of $60,000 and the reduction in the total funds available to Fund Raiser by $60,000, Continental shall release its security interest in the Shares and shall deliver the Share certificates to Segal and the Estate. Fund Raiser specifically acknowledges and consents to the provisions of this Section 8 and acknowledges that the provisions of this Section shall control over conflicting provisions of

any documentation of the Continental Loans.

The entire Giftco stockholding of the Debtor (39,530 shares) is represented by a single Giftco share certificate. A copy of this certificate (no. 8) was admitted as Exhibit A–4. The Debtor's principal, Steven Segal ("Steven Segal") testified that the original Giftco share certificate was delivered to Continental in July 1991, together with an executed irrevocable stock power. Steven Segal further testified that the Intercreditor Agreement was modified pursuant to the terms of a certain Letter Agreement (the "Letter Agreement") in October 1992 to provide, *inter alia*, that the "release price," so to speak, for the Giftco stock under the original Intercreditor Agreement was increased from $60,-000 to $170,000. A copy of the Letter Agreement has been admitted as Exhibit A–5. Steven Segal testified that the foregoing condition had been met (i.e., the payment had been made) and the original share certificate had been delivered by Continental to one Arthur Silverman, Esquire ("Silverman"), counsel for Ruth Segal and the Estate, on December 17, 1992. The basis for his belief in this regard appears to be, *inter alia*, a letter he received from Silverman dated December 18, 1992, describing and enclosing another letter from Silverman to Continental dated December 16, 1992, which recites that payment of $170,000 was therewith being tendered to Continental, together with a request for turnover of the Giftco certificate. A copy of this letter and its enclosure was offered into evidence by Steven Segal. The letter, being a hearsay document, was admitted as Exhibit A–6, over objection, not as evidence that the $170,000 payment had in fact been made, but for the limited purpose of establishing the basis of Steven Segal's belief that the conditions warranting delivery of the Giftco stock to Ruth Segal had obtained, and that Ruth Segal, or her agent, were thus, as of that pre-petition date, in physical possession of the original Giftco share certificate.

Hence, the balance of this opinion focuses on the issues as to Ruth Segal only.

---

1. The relative priorities and/or rights of Ruth Segal and the Estate, *inter se*, under the Pledge Agreement has not figured in this proceeding.

Steven Segal testified that a total of only $9,000 has been paid by the Debtor against the principal and interest obligations under the Ruth Segal Note, and that the outstanding balance of principal, accrued interest and late charges, but exclusive of the payees attorneys' fees (for which no competent evidence was produced), was $142,500.

Steven Segal, a former board member of Giftco, testified concerning the value of the Giftco stock. The Giftco Company, he stated, was originally formed as a buying cooperative by businesses in the fund raising industry. Each member's ownership interest in Giftco was a function of "credits" the member received for purchases from Giftco. The co-operative form of ownership was terminated in the mid-1970's at which time Giftco was converted to a stock company. The Debtor, at that time, received 39,530 shares. The Debtor's equity account as a Giftco co-op member at that time stood at $395,300. This accordingly became the value the Debtor ascribed on its books to the 39,530 Giftco shares it received.

Giftco's stockholders have declined in number from an original high of about 25 to the present level of about 12. Giftco stock does not trade on any market and according to counsel for both the Debtor and Giftco itself, the stockholding must be viewed as completely illiquid or very nearly so. Apparently, the only "transactions" in Giftco stock in recent years have been Giftco's own repurchases of its stock. In this regard, Steven Segal testified that Giftco had in the past offered to buy back the Debtor's Giftco stock for the sum of $150,000. A series of correspondence, admitted as Exhibits A–7, A–8 and A–9, likewise purport to evidence negotiations between Ruth Segal and Giftco relative to a sale of the Giftco stock back to Giftco by Ruth Segal for about the same price. No other offers to purchase the stock have been made, although the record does not reflect what, if any, efforts were ever made to solicit additional offers. On the basis of Giftco's offers to the Debtor and the negotiations evidenced in Exhibits A–7 through A–9, Steven Segal testified that in his opinion, notwithstanding its value as car-

ried on the Debtor's books, the Giftco stock is worth only between $150,000 and $175,000.

Giftco, which alleges a large ($200,000) unsecured claim against the Debtor, but which also supports the Ruth Segal 362(d) Motion because of its apparent desire to consummate a repurchase of the Giftco shares from Ruth Segal if the Bankruptcy stay is modified, agrees that the value of the Debtor's Giftco stock holding should be measured by the Giftco repurchase offer of $150,-000. If that value is accepted, it is clear that there is little, if any, equity in the asset over and above the secured claim of Ruth Segal.

The Committee proposes that the 362(d) Motion be denied on several bases. First, it argues that Ruth Segal is unperfected as to the Giftco stock because she personally never came into physical possession of that stock, if at all, until after the filing of the involuntary bankruptcy petition which commenced the Debtor's case. Second, the Committee argues that, if possession of the stock in Segal can be found through her attorney Silverman's possession of the stock on December 16, 1992, this "perfection," within a matter of a few days before the filing of the Bankruptcy Petition, is an avoidable preference under 11 U.S.C. § 547, or, in the alternative, a transfer without consideration which is constructively fraudulent as to unsecured creditors, and thus avoidable under 11 U.S.C. § 548.

Finally, the Committee disputes the existence of equity and challenges the proposed valuation of $150,000. The Committee argues that 1) Giftco's offer reflects only its incentive to repurchase its stock for the lowest price and is not a true indicia of the intrinsic value of the Giftco Company, or its assets, and 2) Ruth Segal's willingness to accept a $150,000.00 offer is reflective of the fact that her secured claim has only been proven to the extent of $142,500. A sale at any price in excess of that figure will pay her claim in full. Accordingly, the Committee argues that whether Segal is perfected or not, the value of the Giftco stock is being underestimated in a "sweetheart" deal between Ruth Segal and Giftco. The § 362(d) Motion, it urges, should therefore, be denied so that the Committee can propose a plan of

reorganization which calls for either additional marketing of the Giftco stock or its distribution, in kind, to unsecured creditors of the Debtor.

## DISCUSSION

■ A threshold issue in this contested matter is whether Ruth Segal holds a perfected security interest in the Giftco stock and, if so, when her lien was perfected. If Ruth Segal holds a non-avoidable perfected security interest in the Giftco stock, it then becomes necessary to value the Giftco stock and determine whether the automatic stay should be modified under 11 U.S.C. § 362(d). As the party contesting the proper perfection of Ruth Segal's security interest in the Giftco stock, the Committee bears the burden of proof as to that issue; 11 U.S.C. § 362(g)(2); *In re Allstar Building Products, Inc.*, 834 F.2d 898 (11th Cir.1987). Ruth Segal nevertheless has an initial burden of production. *See In re Purnell*, 92 B.R. 625, 631 (Bankr. E.D.Pa.1988)—(Creditor seeking relief from the automatic stay bears initial burden of production) and *In re Kim*, 71 B.R. 1011, 1014 (Bankr.C.D.Calif.1987) (creditors' initial burden means establishment of *prima facie* case that an obligation is owed to the creditor by the Debtor, the obligation is secured by a valid security interest and cause, such as a post petition default, exists.)

In this instance, the existence of the underlying indebtedness and the occurrence of a default do not appear to be genuinely in dispute. Indeed, the Debtor basically has admitted both facts. The Committee for its part has demanded "strict proof" on all issues. The court finds that Exhibits A-1 and the testimony of Steven Segal satisfy this standard as to both existence of the debt and the existence of a default, even if the Debtor's admissions alone would not.

Testimony likewise satisfactorily established that the outstanding balance owed to Ruth Segal by the Debtor is, at a minimum, $142,500.

■ Perfection of a security interest in a stock certificate in 1991 (when the Ruth Segal loan transaction was consummated) was governed by the provisions of Section 9305 of Article 9 of the Pennsylvania UCC, (13 Pa. C.S.A. 9305) which provided at the time, as follows:

### § 9305 When possession by secured party perfects security interest without filing

A security interest in letters of credit and advices of credit (section 5116(b)(1)), goods, instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the interest of the secured party. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this division.

The security interest may be otherwise perfected as provided in this division before or after the period of possession by the secured party.

For purposes of the above, the term "instrument" separately defined at Section 9105, included a "security," as that term was defined at Section 8102 of Article 8 of the UCC. Prior to certain 1992 amendments to the UCC, Section 8102 defined only the single term "security" and did so, as follows:

### "Security"

(1) A "security" is an instrument which:

(i) is issued in bearer or registered form;

(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment;

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(v) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

(2) A writing which is a security is governed by this division and not by Division 3 (relating to commercial paper) even though

it also meets the requirements of that division. This division does no apply to money.

(3) A security is in "registered form" when it specifies a person entitled to the security or to the rights it evidences and when its transfer may be registered upon books maintained for that purpose by or on behalf of an issuer or the security so states.

(4) A security is in "bearer form" when it runs to bearer according to its terms and not by reason of any indorsement.

Case law construing the predecessor statute had held that a security could include stock in a closely held corporation. *See Katz v. Abrams,* 549 F.Supp. 668 (E.D.Pa.1982). In 1992, the definition of a security was expanded to include "certificated" and "uncertificated" securities, and perfection of a security interest in a certificated security came within the ambit of UCC Article 8, specifically Section 8313 and 8321. Under these amendments the instant Giftco stock appears to the Court to be a *certificated* security in *registered* form in that it

(i) specifies a person (here Fund Raiser Products) who is entitled to the security and

(ii) may be transferred by registration upon books of the issuer maintained for that purpose (as Exhibit A–4 so provides). 13 Pa.C.S.A. 8102(a).

The 1992 amendments are of little moment to the instant controversy because both before and after the 1992 amendments, a security interest in the Giftco stock could clearly be perfected via possession. Aside from the questions of enforcement, attachment perfection and termination, issues relative to security interests in securities remains subject to the provisions of Article 9 (*See* 13 Pa.C.S.A. 8321(c)).

▮ The Committee does not appear to dispute the foregoing but argues instead that to be properly perfected Ruth Segal *herself* must possess the stock certificate. The court disagrees. Under both 13 Pa.C.S.A. 9305 and 13 Pa.C.S.A. 8313, possession via an agent is contemplated. Official Comment

No. 2 to Code Section 9305 for example provides that:

2. Possession may be by the secured party himself or by an agent on his behalf; it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party. See also the last sentence of Section 9–205. Where the collateral (except for goods covered by a negotiable document) is held by a bailee, the time of perfection of the security interest, under the second sentence of the section, is when the bailee receives notification of the secured party's interest: this rule rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf.

*See also In re Clinton Hospital Association,* 142 B.R. 601, 604 (Bankr.D.Mass.1992) (Possession by agent perfected Bank's security interest in securities.)

While there is no comparable comment to the corresponding Section of Article 8, both Sections 8321 and 8313 expressly envision a perfected transfer to a "person designated by the secured party." Transfer of the Giftco certificate to Continental in July 1991 and then to Silverman in December 1992, would, accordingly, appear to qualify as a transfer of possession to Segal, *Accord: Landmark Land Co. v. Sprague,* 529 F.Supp. 971 (S.D.N.Y.1981).

Under 13 Pa.C.S.A. 9303, dealing with the continuity of perfection, Ruth Segal would thus appear to have been continuously perfected in the Giftco stock from the time of its initial transfer to Continental in July 1991. This continuum of perfection obviates both the Committee's preference theory under 11 U.S.C. 547 as well as its fraudulent transfer theory under 11 U.S.C. 548.

▮ In view of Ruth Segal's perfected security interest in the Giftco stock, it next becomes necessary to value that asset and determine the presence or absence of equity over and above Ruth Segal's $142,500 secured claim. As the movant, Ruth Segal bears the burden of proof on this issue. 11 U.S.C. 362(g)(1).

A useful introduction to the task of valuation under the Bankruptcy Code appears in *In re Demakes Enterprises,* 145 B.R. 362 (Bankr.D.Mass.1992), and is repeated here:

The Bankruptcy Code directs the Court to determine a property's value "in light of the purpose of the valuation and of the proposed disposition or use of the property...." 11 U.S.C. § 506(a). Not surprisingly, a systematic method for valuing collateral has not evolved, due to Congress' intention that valuations be made on a case by case basis. S.Rep. No. 989, 95th Cong.2d Sess. 54 U.S.Code Cong. & Admin.News pp. 5797, 5840 (1978) ("Courts will have to determine value on a case by case basis, taking into account the facts of each case and the competing interests in the case"). *See D.G. Carlson, Secured Creditors and the Eely Character of Bankruptcy Valuations,* 41 Am.U.L. rev. 63, 64 (1991) ("Not surprisingly, bankruptcy courts have indeed gratified the wishes of Congress by producing an extremely diverse and contradictory set of valuation theories.") This mandate to make new decisions regarding valuations with each case is further complicated when one realizes that the "value" ascribed to collateral is little more than a "shadow," J.F. Queenan, Jr., *Standards for Valuation of Security Interests in Chapter 11,* 92 Commercial L.J. 18 (1987), or an estimated prediction of the price the property would bring at a future auction. D.G. Carlson, *Unsecured Claims Under Bankruptcy Code Sections 506(a) and 1111(b); Second Looks at Judicial Valuations of Collateral,* 6 Bankr. Dev.J. 253 263 (1989). The latter commentator noted, "[u]nless the collateral is highly fungible and stable in price, valuations are inherently uncertain...." *Id.*

Bearing the foregoing in mind it is clear that fair market value is generally characterized as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). This general definition lends itself best to tangibles for which there is a reason-

ably ready market. The Court questions whether it is easily adaptable to the Stock at issue here.

A similar question involving valuation of closely held stock faced the Court in *In re Hubbard,* 135 B.R. 430 (S.D.Fla.1991) Citing *Estate of Murphy,* T.C. Mem. 1990–476, 60 T.C.M. (CCH) 645, the Court in *Hubbard* noted the following factors as relevant to the value of a closely held company:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks or corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over the counter.

The *Hubbard* Court, likewise, noted that a discount may be appropriate where the block of the stock in question is a minority of the total shares and will therefore not transfer control of the entity to the purchaser. As in *Hubbard,* this Court is faced with a relative paucity of evidence going to the underlying value of Giftco. There is no evidence in the record with respect to subheadings (b), (c), (d), (e), (f) or (h). There is however some evidence as to subheadings (a) and (g).

All parties concede that Giftco is a closely held company the shares in which have no ready market. Ruth Segal contends that Giftco's own offer to repurchase the shares for $150,000 is therefore the best benchmark of its value. The Court agrees. Although the committee's position is not without some merit, its mere allegation that the intrinsic value of the underlying company is such that the Giftco shares are in reality worth far

more than the $150,000 offered cannot carry the day. The Committee was free to present financial data concerning Giftco in order to buttress its argument, or at least, the Court perceives no impediment to its ability to have presented such data. Moreover, it is worth noting, on this score, that Giftco, through its counsel was present and participating in this proceeding. As in *Hubbard,* this Court has been presented with evidence that the Company in question is a going concern and that the Debtor's block of stock represents a minority interest. Similarly the Court has been presented with some evidence of value, i.e., a $150,000 purchase offer. As in *Hubbard,* this Court will not make assumptions regarding value, but will instead rely upon the evidence presented. The testimonial and documentary evidence proffered by Ruth Segal are competent evidence sufficient to meet her evidentiary burden. *In re Kim, supra,* 71 B.R. at 1016; *In re Schramm,* 12 B.R. 608, 610 (E.D.Pa.1981). Under the totality of the circumstances the Court concludes that Ruth Segal has met her burden of establishing that the Giftco stock is worth approximately $150,000 and that there is, therefore, no meaningful equity in the Giftco stock in excess of her secured claim. As the Debtor is not operating and has not been operating for quite some time, the Court easily concludes that the Giftco stock is not necessary for an effective reorganization of the Debtor's affairs. Accordingly, modification of the automatic stay under 11 U.S.C. 362(d)(2) is appropriate.

Similarly, even if one might argue that there is nominal equity in the asset, measured by the $150,000 purchase offer less the $142,500 Ruth Segal claim, the fact that this "equity cushion" is so small, coupled with the fact that the Debtor is not operating nor making any current payments against the Ruth Segal Note, would lead the Court to conclude that Ruth Segal's interest in the stock is not adequately protected and that "cause" therefore exists to modify the automatic stay as to Ruth Segal under 11 U.S.C. 362(d)(1). An Order to this effect will therefore be entered.

A separate Motion to convert or dismiss this case has been filed by the United States Trustee and remains pending. At the January 12, 1994 hearing the Debtor through its counsel advised the Court that it did not oppose the Trustee's Motion. The Committee, for its part, opposes the Motion, and contemplates proposing a liquidating Plan of Reorganization if the instant 362 Motion is denied. Giftco through its counsel supported conversion or dismissal of this Chapter 11 case.

At the hearing on January 12, 1994, the Trustee's Motion was held under advisement pending the outcome of the Ruth Segal 362 Motion. As that Motion is being granted, and as the Giftco Stock will presumably therefore shortly pass from the Debtor's estate, it is appropriate to resolve the Trustee's Motion at this time.

The remainder of the assets of the Debtor's estate consist of a fund of cash (approximately $155,059), accounts receivable (approximately $230,000), claims against insiders (approximately $128,421) and prepaid expenses of $5,600. Given the Company's status (i.e., non-operating), the court concludes that liquidation and distribution of the foregoing assets would best be conducted under the provisions of Chapter 7 of the Bankruptcy Code. Accordingly, the Trustee's Motion will be granted and this case will be converted to Chapter 7.

Orders consistent with the foregoing conclusions accompany this Opinion.

### ORDER

**AND NOW,** this 8th day of February, 1994, upon consideration of the Motion of Ruth Segal for relief from the automatic stay provisions of 11 U.S.C. 362, and after hearing thereon, it is hereby:

**ORDERED,** that the Motion is granted.

### ORDER

**AND NOW,** this 8th day of February, 1994, upon consideration of the U.S. Trustee's Motion to Convert the instant case to a proceeding under Chapter 7, it is hereby:

ORDERED, that the Motion is granted and the instant case is converted to a proceeding under Chapter 7.