**In re Guido FREZZO, Debtor.**

**Bankruptcy No. 97–16286SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 5, 1998.

---

Mark Blank, Jr., Paoli, PA, for Debtor.

Gloria Satriale, Chester Springs, PA, Trustee.

### OPINION

STEVEN RASLAVICH, Bankruptcy Judge.

*Introduction.*

The Court has before it two contested matters in the above Chapter 7 case. The first is a Motion under 11 U.C.S. § 363(f) by the Chapter 7 Trustee, Gloria Satriale, which seeks leave to sell the Debtor, Guido Frezzo's, fifty percent (50%) shareholder interest in a corporate mushroom composting business known as Frezzo Brothers, Inc., free of liens, claims and encumbrances, to the Debtor's brother and business partner, James Frezzo, for the sum of $1,290,000. This Motion is opposed by the Debtor, his ex-spouse, Philomena Frezzo, and their daughter Anita Swayne. (Collectively "the Objectors") The basis for their objection, generally, is that the price is insufficient. The second matter before the Court is the Debtor's objection to the Proof of Claim of his ex-spouse Philomena, which is asserted as unsecured and without priority in the amount of $1,375,000. Ms. Frezzo's claim relates to an equitable distribution award in her favor which emanated from the Court of Common Pleas of Chester County, Pa. in April of 1996 incident to the Frezzo divorce proceeding. A combined hearing on both matters was held on February 11, 1998 and post-trial briefs have been submitted by the parties. For the reasons which follow, the Trustee's Motion will be granted and the Debtor's objection to claim will be sustained, in part.

*Background.*

This case was commenced under Chapter 7 of the Bankruptcy Code on May 21, 1997. At that time the Debtor was the owner of a fifty percent (50%) shareholder interest in Frezzo Brothers, Inc. The Debtor's brother, James Frezzo, is the owner of the other fifty percent (50%) of the company's stock. The company produces and sells compost to mushroom farms in the northeast portion of the United States, but primarily in the area of southern Chester County. The Chapter 7 Trustee is Gloria Satriale. She, of course, is charged with the liquidation of the Debtor's non-exempt property and the distribution of the proceeds thereof to creditors in accordance with the scheme set forth in the Bankruptcy Code. In the course of her duties, the Trustee was approached, sometime after her appointment, by James Frezzo, who offered to purchase the subject shares of Frezzo Brothers, Inc., for the sum of $1,000,000. The Trustee declined to immediately act on this offer for the reason that she lacked an appraisal of the Debtor's stock interest. There were not at that time, nor apparently are there now, any liquid assets in the bankruptcy estate. The Trustee therefore requested that the prospective buyer obtain an appraisal of the asset at his own expense. In response, James Frezzo retained the accounting firm of Miller Tate and Company to prepare a valuation study. The subsequent written valuation report was introduced into evidence as Trustee's Exhibit T–1. Expert testimony concerning the report was elicited from its preparer, Stephen J. Scherf, CPA. The Scherf report estimates the fair value of the Debtor's stock interest in Frezzo Brothers, Inc., to be $1,290,000.

In reaching this opinion, Mr. Scherf utilized two of three traditional methods of valuing an asset such as exists here. The first of these was the capitalization of income approach, whereby one endeavors to ascertain the value of an asset through the present value of its anticipated future cash flow. The second approach used by Scherf to measure the value of the stock interest was an inquiry into the fair value of the assets of the compa-

ny net of its liabilities. No attempt was made to value the stock interest via comparable sales, which is a third valuation methodology routinely employed by appraisers, as no information on actual, let alone public, transactions of a similar nature was available to Scherf.

The two analyses undertaken by Scherf produced two nearly identical values: $1,290,000 vs. $1,285,000. The appraiser did not "split the difference," but rather adopted as his opinion the higher of the two values.

The Objectors offered little evidence, expert or otherwise, to refute the Scherf report. They nevertheless maintain that the stock in question is worth $2,500,000. The thrust of their assertion that the Debtor's stock interest in Frezzo Brother's Inc., is worth $2,500,000 hinges on a series of arguments. First, they note that in testimony given in the Frezzo divorce proceeding, Guido Frezzo and his brother James agreed that Frezzo Brother's Inc., had an aggregate value of $5,000,000. Moreover, they point out that James Frezzo at that time offered to purchase his brother's stock interest in the business for the sum of $2,500,000. The special master, appointed by the Chester County Court of Common Pleas to prepare a report for the equitable distribution of Guido's and Philomena's marital property, adopted the aforesaid agreed value for the corporate stock (see Objector's Exhibit O–1), and recommended that Philomena Frezzo be awarded fifty-five percent (55%) thereof, or $1,375,000, and that the debtor be awarded the balance of forty-five percent (45%) or $1,125,000. The Master's report and recommendation were adopted by the Court in Chester County by Order dated April 29, 1996.

A sale of Guido's stock to James for $2,500,000 obviously never took place. However, Guido testified at the hearing of February 11, 1998 that he continues to believe that the $5,000,000 aggregate valuation for the company's shares is fair and reasonable. The Objectors specifically challenge the "independence" of the lower appraisal value set forth in the report prepared by Scherf at James Frezzo's request. They contend that the "new" valuation is a transparent guise by

James Frezzo, who seeks to capitalize on the present circumstances. They argue that the shareholders own agreement in April of 1996 is the best indicator of the company's value. In this respect, too, they argue that James Frezzo's offer cannot be found to be a "good faith" offer in light of the foregoing case history, and that the Trustee's motion to approve a sale to James Frezzo must therefore fail.

In the alternative, the Objectors criticize the Trustee for failure to have marketed the shares more vigorously. They hypothesize the existence of other potential competing bidders for the stock, were the purchase opportunity to be advertised and marketed through a broker. Finally, the Objectors contend that the Trustee has failed to adequately explore the possibility of selling the estate's and James Frezzo's stock interest as an entirety, under 11 U.S.C. § 363(h), in an effort to generate the highest overall price for the shares of both individuals. The Court has carefully examined the Objector's arguments, and finds them all to be without merit.

### Discussion.

As Colliers points out in discussing the applicable legal standard for approval of a proposed sale under section 363 of the Bankruptcy Code:

> In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated in various ways, represent essentially a business judgment test. Some courts have described the standard as one of "good faith" or of whether the transaction is "fair and equitable." Others question whether the sale is "in the best interest of the estate." In the context of sales of substantially all of the assets of the estate, some courts have required that the price to be paid be "fair and reasonable." Although a debtor normally would be expected to sell to the highest bidder at an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale. For example, the payment terms may be more favorable, or the debtor may have substantial reason to doubt the ability of the higher bidder to raise the cash neces-

sary to complete the purchase. Collier on Bankruptcy, Volume 3 (Fifteenth ed. Revised) ¶ 363.02[1][g] at page 363–14. (citations omitted)

Colliers notes further that in a liquidation case the trustee has ample administrative flexibility in the conduct of sales. For example, it is clear that property may be sold at a public or private sale. See: Bankruptcy Rule 6004. Amplifying this point, Judge Fox of this Court once observed the following:

> A chapter 7 trustee has considerable discretion in the exercise of her statutory duties. *Accord* L.King, 4 *Collier on Bankruptcy*, ¶ 704.04[1] at 704–11 (15h ed.1996) ("a trustee is given a range of discretion in making judgments about how to carry out the duties set forth in the statute..."); *see, e .g., In re Bobroff,* 1990 WL 178557 (E.D.Pa.1990) ("The trustee's duty is often summarized as one of reasonable diligence towards the discharge of their statutory duties under § 704"). The exercise of this discretion encompasses the manner in which to liquidate estate assets. *See In re Canyon Partnership,* 55 B.R. 520, 524 (Bankr.S.D.Cal.1985) ("section [363] clearly indicates that the manner of sale is within the discretion of the Trustee"); *see also In re Lundborg,* 110 B.R. 106, 108 (Bankr.D.Conn.1990) (a trustee has the discretion to exercise judgment that is reasonable under the circumstances); *In re Haugen Const. Service, Inc.,* 104 B.R. 233, 240 (Bankr.D,N.D.1989) (same). This discretion is reviewable by a bankruptcy court, *In re Persky,* 893 F.2d 15, 18 (2d Cir.1989), but so long as the trustee acts reasonably and in the best interests of the estate, and so long as she obtains fair value for the property under the circumstances of the case, her choice of method of disposition will be respected.

Memoranda Opinion *In re Naomi Gordon Magaziner* August 12, 1996; B.K. No. 89–11589. (Fox, J.)

■ The Third Circuit Court of Appeals itself has spoken to certain of the issues raised here in its opinion in *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir.1986). There, the Circuit Court noted that unfortunately neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define the phrase "good faith" and that court's applying section 363(m) have therefore turned to traditional equitable principles, holding that the phrase encompasses one who purchases in "good faith" and "for value." *Id.* The requirement that a purchaser act in good faith speaks to the integrity of his conduct in the course of the sale. As noted in *Abbotts,* typical misconduct which would destroy a purchaser's good faith status would involve fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders. Similarly, the *Abbotts* Court noted that, traditionally, courts have held that fair and equitable consideration is given in a Bankruptcy sale when the purchaser pays 75% of the appraised value of the assets. *Id.* at 149.

■ As this Court noted in *In re Fund Raiser Products, Inc.,* 163 B.R. 744 (E.D.Pa. 1994), the valuation question can become somewhat murky where the asset in issue is a non-controlling stake in the stock of a closely held corporation, as opposed to a tangible asset for which there exists a reasonably ready market. Under the former circumstances this Court, in *Fund Raiser,* adopted an approach which favored consideration of certain specific factors, as follows:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks or corporations engaged in the same or a similar line of business having their stocks actively traded in a free and

open market, either on an exchange or over the counter. *Id.*, at page 750.

 Having considered the good faith and valuation questions presented here, against the backdrop of the instant evidentiary record and the foregoing applicable legal precepts, the Court is satisfied that the Trustee's proposed sale passes muster.

First, and perhaps foremost, the Court notes that the Objectors do not, nor can they, quarrel seriously with the Scherf report's valuation of the business via the income capitalization method. The data used to prepare that valuation was historical financial information of the company itself. In this respect, the income and expense figures used for fiscal years 1993 through 1996 derive from the company's own income tax returns and independently *audited* financial statements (see for example Exhibit B–2). This financial information reflects a severely erratic stream of earnings over the years, and a sizable operating loss thus far in the current period. Scherf's calculation of an appropriate capitalization rate in the face of this (Appendix D) appears to comport with accepted practice, but produced the seemingly high "cap" rate of 25.1%. But for this unusually high interest rate the indicated value of the company via the income approach would arguable have been higher. The Court finds no fault, however, with the high capitalization rate in this instance, particularly given James Frezzo's testimony as to the declining fortunes of the industry in which the company does business. The risk factors, in other words are unusually high. More importantly, even after capitalizing the company's income stream, a significant, if not principle, component of Scherf's "income" valuation for the company consisted of the value of certain non-operating real estate owned by the company. His report at Appendix B places that value at $3,757,850. Scherf's report was challenged under cross examination on this point for failure to adequately consider the intrinsic value of the company's non-operating realty, but this criticism seems unfounded. Scherf's aggregate land value differs but slightly from the aggregate *appraised* land value set forth in the Chester County Special Master's report. (Exhibit O–1 at page 22) This figure was in large part the basis for the Master's reliance on the $2,500,000 value agreed to by the Frezzo brothers.

Other things being equal, Scherf himself would have arrived at a value of $2,049,913 for Guido's interest in Frezzo Brothers, Inc. (See Appendix B). The difference, and in actuality the nub of the Objector's complaint, lies in the discounts Scherf next exacted from the stock value: i.e., 10% for lack of control, and 30% for lack of marketability. These discounts produced an aggregate reduction of $758,489, leaving the aforesaid $1,290,000 indicated value for 50% of the company's shares.

The rational for the foregoing two reductions was testified. to by Scherf, although by their titles the nature of the reductions are basically ·self-evident. The particular percentages selected by Scherf are elaborated on at Appendix E to his report. The value of Guido's stock obviously fluctuates in reverse proportion to these percentages; that is to say, as the percentages increase, the value of Guido's stock interest decreases.

Intuitively, this Court finds nothing inherently objectionable in the reasons for Scherf's two discounts; i.e., lack of control and lack of marketability. They are factors to be considered in valuing a block of stock as discussed in *Fund Raiser, supra.*, and they are factors routinely applied by experts in deriving estimates of values. The particular percentages applied by Scherf in this instance produced a significant adverse monetary effect, but given the circumstances, they might arguably be defended as conservative.

In Appendix "E" to his report Scherf notes that discounts in excess of 35% exist, on average, for the purchase of minority stock interests. While the instant stock interest is, of course, not a minority position, neither for that matter is it a majority one. The most a third party purchaser could ensure himself of in acquiring Guido's shares is a potential impasse with James over control of the company. The Court wonders, on these facts, if the appropriate lack of control factor ought not to be worth more than a modest 10%.

Scherf's lack of marketability discount is the higher of his two reductions, but it, too, is in line with published studies of private transactions. Moreover, the testimony of every witness offered on February 11, 1998, confirmed the insular nature of the mushroom compost industry. This fact, coupled with the absence of any comparable transactions of record, satisfied the Court that Scherf's discount, albeit a sizable one, does not unrealistically estimate the economic impact attendant to the limited capacity to freely trade an interest such as that at issue herein.

As noted, Scherf's asset valuation approach resulted in a nearly identical valuation for Guido's stock interest. The asset and liability information utilized by Scherf in this respect was drawn from the same unimpeachable sources as the data used in the income capitalization analysis. Scherf notes that the company has no history of dividend payments, and that there are no significant intangible assets. Goodwill is not listed on the balance sheet, and the evidence suggested that if the same exists at all, it is inherent in the personal relationships between the Frezzo brothers and their customers. In light of that, the Court concludes that any such goodwill would probably be inconsequential, and non-quantifiable. Certainly, the Court has no evidence to the contrary before it.

A factor not relevant in the income approach, but one which must be taken into consideration when valuing the net assets of a company, is taxes. In this respect, Scherf deducted a hypothetical capital gains tax of 35% for a sale of the company's assets. No specific attempt to challenge this deduction was made by the Objectors, and the Court has only limited trouble with it. A reduction for potential taxes is certainly appropriate. Indeed, the Chester County Special Master himself specifically indicated on page 28 of his report that he, too, would reduce the value of Frezzo Brothers Inc., for potential income taxes, and that he would further reduce it for transaction costs as well, should sale of the company's assets be necessary to realize their cash value. The only question is whether the nearly maximum marginal tax rate of 35%, which was chosen by Scherf,

would be the appropriate rate to utilize for these parties or, if it were appropriate, whether the tax liability would actually obtain given the parties economic circumstances. The Court has insufficient evidence before it to answer that question with certainty. However, it is highly unlikely that any deviation, unless drastic, would make a material difference in the outcome of the parties dispute. The reason for this is that the prospective buyer, James Frezzo, has offered the Trustee 100% of the appraised value of his brother's stock interest as determined in the Scherf report. As previously noted, 75% of appraised value was cited in *Abbotts supra.* as a traditional threshold for the fair value test. The tax consequences discussed in Scherf's report would have to vary substantially before James Frezzo's present offer would fall below 75% of the appraised value of Guido's stock using the asset valuation method.

In light of the evidence presented, the Court is hard pressed to reach any conclusion other than that James Frezzo's purchase offer satisfies the fair value test. This brings the Objectors specific dissent into sharp relief. They do not so much refute the Scherf appraisal, as argue that, where others might rely on it, in light of the case history James Frezzo should not be similarly entitled. Their sole support for this proposition is the valuation and purchase offer which attended the Frezzo divorce proceeding. For several reasons the Court is unpersuaded by this argument.

The brothers self appraisal of their company in 1996 is not irrelevant, but its probative weight does not, in the Court's view, exceed that of the Scherf report. Other than the land values, as to which both the brothers and Scherf are largely in agreement, the brothers 1996 appraisal appears to have been simply a "ball park" estimate on their part. It may even have been a good one at the time. Their estimate, however, is almost two years old, and the business has admittedly declined in the interval. James Frezzo testified that his intention in 1996 was to fund the purchase through a combination of cash and a transfer of some land. No sale of stock, such as would draw the aforediscussed reduc-

tions into play, would have been relevant to the brothers assessment of the value of their business as an entirety; and as laypersons they might not have appreciated how the "market" might value their business if less than the whole business were being sold.

James Frezzo further testified that, in making his earlier offer, he had failed to take potential tax ramifications into consideration. The present proposed transactions is an all cash sale, which no doubt enhances its appeal, even if it arguably were to be for less than the maximum price obtainable. The Court recognizes and has taken into account that James Frezzo now wishes to distance himself from his earlier, higher estimate of his company's worth. Yet the Court is not prepared to find in this furtherance of his own self-interest, the level of misconduct which might disqualify him as a good faith purchaser for value under *Abbotts*. As noted, the brothers 1996 estimate of their company's worth appears to have been partially informed by appraisals, but partially "seat of the pants." Whatever the basis for the brothers 1996 estimate for the business was, the evidence before the Court today presents a different picture, the validity of which has in no way been undercut by the Objectors. In effect, the Objectors ask the Court to penalize James Frezzo by requiring him to pay more for his brother's stock than the evidence has shown it to now be worth. Neither the law, nor the record before the Court, support that result.

Indeed, in clinging to their position, the Objectors give short shift to a troublesome issue in this case which might easily have been of more than passing significance. The bylaws of Frezzo Brothers, Inc. (Exhibit B–1) at Article VIII provide that:

None of the shares of stock of this corporation, whether now or hereafter issued, shall be sold, bequeathed, transferred or hypothecated, unless such shares shall have been first offered in writing for sale and transfer to the corporation at a price representing the book value there-of at the time of said offer.

In the event the corporation fails to agree to purchase such shares within a period of thirty (30) days, the offeror shall then offer such shares to the other shareholders, pro rata and in proportion to their present shareholders' equities in the corporation under otherwise the same terms and conditions for which such shares were previously offered to the corporation.

In the event the shareholders fail to agree to purchase such shares within a period of thirty (30) days, the offeror shall then offer such shares to any or some of the other shareholders, irrespective of their present shareholders' equities in the corporation under otherwise the same terms and conditions for which such shares were previously offered to the corporation or proportionately to the shareholders, before the offeror may then sell such shares to any outside party or parties.

The Scherf report reflects that the book value of 50% of the Company's stock, as of the date of the Scherf report, was approximately $850,000. He testified that the same figure, by the hearing of February 11, 1998, had declined to approximately $725,000. He testified, however, that in his opinion the bankruptcy Trustee in all likelihood would not be bound by that restriction. In this he has posed an interesting question.

In 1956 a District Court Judge in the Eastern District of Pennsylvania agreed with him. *See: Trilling & Montague*, 140 F.Supp. 260 (E.D.Pa.1956). More recent authority, however, is less clear, and suggests that a bankruptcy Trustee takes a Debtor's stock subject to such restrictions and applicable corporate bylaws as are enforceable under state laws. *In re Six*, 190 B.R. 958 (Bankr.M.D.Fla.1995), *In re Baquet*, 61 B.R. 495 (Bankr.D.Mont., 1986), *In re Andrews*, 14 B.R. 356 (Bankr.M.D.Tenn.1981), *Groves v. Prickett*, 420 F.2d 1119 (9th Cir. 1970). Nothing in Pennsylvania's business corporation law appears to prohibit the enforcement of such buy back agreements as appear in the Frezzo Brothers, Inc., bylaws. *See* 15 Pa.C.S.A. § 1529. Yet, the transaction to be approved by the Bankruptcy Court must in all events still pass muster under *Abbotts*. At a minimum, there is some room for debate over the question of which principal would prevail. Happily, however, it is unnecessary to join the issue as the prospec-

tive buyer's offer, as noted, is for 100% of the appraised value of 50% of the company stock per the Scherf report. This figure is obviously well in excess of the book value benchmark.

The law does not require James Frezzo to pay a premium in connection with this transaction. It merely requires "good faith" and "fair value." The heavy discounts which have reduced the appraised value of the asset in question clearly operate to James Frezzo's advantage here. But not in any way which is prohibited by law. They might not figure in the equation at all, were there anything to the Objectors argument that the Trustee should seek to sell the brothers' stock interest as an entirety under 11 U.S.C. § 363(h). Regrettably, though, that argument has no merit. 11 U.S.C. § 363(h) permits the trustee to sell the interest of co-owners of property as an entirety, under certain circumstances. Whether those circumstances exist here might be debated, however, the essential predicate is missing. Guido and James do not co-own the property in question. Guido owns his 50% interest outright, as does James. The Bankruptcy Code does not permit the Trustee to force James to submit to involuntary divestment of his stock interest. This, paradoxically, is the very fact which makes Guido's and James' shares less valuable standing alone.

There is no evidence that passing on the present offer in hopes of "marketing" Guido's shares to third parties would produce a greater return. That is merely speculation. It strikes the Court, moreover, as an unfair criticism, for while it cannot be disproven, relinquishing a binding "bird in the hand" offer in the hopes of securing the proverbial "two in the bush," would in the present circumstances strike the Court as a somewhat rash decision on the part of the Trustee.

In turning from this matter, the Court thus reiterates its conclusion that the Trustee and the prospective buyer have satisfied the Court of the propriety of the instant sale under the guidelines set forth in *Abbotts*. The Trustee's Motion to Sell will therefore be approved.

■ This leaves for determination only the amount of Philomena Frezzo's claim against the bankruptcy estate. As previously noted, Ms. Frezzo asserts a claim in the amount of $1,375,000, that being 55% of the value of Guido's stock interest as set forth in the Chester County Special Master's report of February, 1996, the recommendations of which were approved by the Common Pleas Court on April 29, 1996. The Debtor contends that if the Trustee's proposed sale of his stock to James Frezzo is approved, Philomena's claim against him, in turn, should be capped at 55% of the sales price. The parties have advised the Court that they consider their dispute in this respect to present only a question of law; that being the proper interpretation to be given to the Special Master's Report (Exhibit O–1), and the proper effect to be accorded that report in this bankruptcy case. The Court agrees with this assessment, however, in considering the question presented, the Court has arrived at a conclusion which differs from that advocated by either of the parties.

■ The parties focus their attention on the language used by the Special Master in his report. Philomena insists that the Master intended a monetary award in her favor in the amount of her stated claim. Guido, by contrast, insists that the Special Master intended that Philomena receive 55% of the value of Guido's stock when the disposition of the same was achieved. Having carefully reviewed the Special Master's report, the Court believes that Philomena has the better part of this argument. As noted by Philomena's counsel, the Special Master couched his award in specific monetary terms. While the Master's monetary award derived from the assumed value of Guido's shares, it is nevertheless true, that neither the Master's report nor the Court's Order required Guido to divest himself of the shares. He could satisfy his equitable distribution debt through the payment of cash, while retaining the asset in kind for himself. In this respect, the Special Master's report must be viewed in its entirety. The marital estate of the Frezzo's consisted of various and sundry assets, all of which were considered by the Special Master in arriving at his final conclusions. His final conclusions were likewise the product of his assessment of the future income earning ca-

pacities of the parties following their divorce. All of these decisions, including the Master's assessment of the value of Guido's Frezzo Brother's stock interest, were made as of the point in time when the Master's report issued. Ordinarily, the date chosen by a Court valuing marital assets will control in the absence of an abuse of discretion. See: *Aletto v. Aletto,* 371 Pa.Super. 230, 537 A.2d 1383 (1988), *Sutliff v. Sutliff,* 518 Pa. 378, 543 A.2d 534 (1988).

As this Court has noted, it is conceivable that the value of Frezzo Brothers, Inc., as agreed to by the brothers and adopted by the Master in 1996, may well have been accurate at that time. The fact that the stock value may have changed in the intervening years does not constitute legal justification to disregard the monetary award awarded in Philomena's favor, nor has any authority for that proposition been presented to the Court. At bottom, Guido's argument is that he is the victim of unfairness. Philomena's claim against him, he argues, has remained fixed, while the value of the asset from which he must discharge that obligation has declined. That possibility, however, existed at the time the Special Master issued his report in April, 1996. It could have, and perhaps should have, been appreciated by Guido at that time. While the record falls short of enabling the Court to assess blame, in any direction, for the delay in the resolution of the parties equitable distribution settlement, and while the Court recognizes that this has in turn produced Guido's present dilemma, it is insufficient for Guido simply to assert in the abstract that the adverse economic impact must be apportioned between he and his ex-wife. The Special Master's report specifically contemplated that potential disposition of the stock interest, or perhaps separate sale of parcels of land, might be necessary in order for Guido to satisfy his obligations. He easily could have fashioned his report in a manner designed to assure that both spouses would share either the risks or the rewards that might attend the passage of time. He did not do so, and this Court will not read into his report an intent which is not present. Accordingly, Philomena's gross award of $1,370,000 must be sustained.

The Special Master did, however, specifically indicate that he would reduce Philomena's award, if sale of the stock or the business were necessary to satisfy it, by the taxes and transaction costs which followed. The Court therefore feels that these must now be taken into consideration. This presents a somewhat difficult question on the present record, however, in an effort to bring closure to this situation, the Court has proceeded as follows: the gross tax effect of disposition of the business is estimated in Appendix C to the Scherf Report to be $985,-000. One-half of this amount; i.e. the half attributable to Guido's interest, comes to $495,500. The Court will assume that transaction costs for the $1,290,000 sale of Guido's interest would be roughly 7%, or $90,300. The sum of these two figures is $585,800. Allocating these costs evenly between Philomena and Guido, which the Court deems to be fair produces a reduction in Philomena's allowed claim in the amount of $292,900, leaving her with a net unsecured claim of $1,077,100.

The Court recognizes that its calculation of the tax effect of the transaction, as well as the transaction costs, may be imprecise. Philomena's unsecured claim however will be allowed in the aforesaid amount, recognizing that the parties can request amended findings if subsequent events prove that to be warranted.

An appropriate Order accompanies this Opinion.

## ORDER

And Now, this 5th day of March, 1998, upon consideration of the Motion of the Chapter 7 Trustee, Gloria Satriale, for leave to sell a certain stock interest of the above Debtor to James Frezzo for the sum of $1,290,000, pursuant to 11 U.S.C. § 363(f), the opposition thereto, of the Debtor, his ex-spouse, Philomena Frezzo, and their daughter, Anita Swayne, and after hearing held February 11, 1998, it is, for the reasons stated in the within Opinion:

**ORDERED** that the Motion be and hereby is **GRANTED**; and it is further,

**ORDERED**, that upon consideration of the objection of the Debtor to the claim of his ex-spouse, Philomena Frezzo, the response thereto of the claimant, and after hearing likewise held February 11, 1998, it is hereby:

**ORDERED**, that the objection be and hereby is sustained in part. The claim of Philomena Frezzo shall be and hereby is allowed as unsecured, and without priority, in the amount of $1,077,100.